**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

BRIAN SASS,
                    *Petitioner-Appellant,*

          v.

CALIFORNIA BOARD OF PRISON
TERMS; ATTORNEY GENERAL OF THE
STATE OF CALIFORNIA,
                    *Respondents-Appellees.*

No. 05-16455

D.C. No.
CV-01-00835-MCE

OPINION

Appeal from the United States District Court
for the Eastern District of California
Morrison C. England, District Judge, Presiding

Argued and Submitted
March 16, 2006—San Francisco, California

Filed August 31, 2006

Before: Alfred T. Goodwin, Stephen Reinhardt, and
Michael Daly Hawkins, Circuit Judges.

Opinion by Judge Goodwin;
Dissent by Judge Reinhardt

10563

**COUNSEL**

Margaret Littlefield and Michael Satris, Law Offices of Michael Satris, Bolinas, California, for the petitioner-appellant.

Julie L. Garland, Supervising Deputy Attorney General, San Diego, California, for the respondent-appellee.

**OPINION**

GOODWIN, Circuit Judge:

California state prisoner Brian Sass appeals the district court's denial of his petition for a writ of habeas corpus. Sass argues that the California Board of Prison Terms' decisions, in 1999 and 2000, denying him parole violated his due process rights.

We hold that California inmates continue to have a liberty interest in parole after *In re Dannenberg*, 34 Cal. 4th 1061 (2005). However, the state court decisions upholding Sass' parole denials were not contrary to, and did not involve an unreasonable application of, clearly established federal law as determined by the Supreme Court. For this reason, we affirm.

I.[1]

---

[1]We deny the government's motion for reconsideration of the order granting Sass' motion to supplement the record on appeal.

In 1988, Sass was convicted of second degree murder, gross vehicular manslaughter, hit and run death, causing injury while driving under the influence, and felony drunk driving. He was sentenced to fifteen years to life with the possibility of parole. The California Board of Prison Terms ("the Board") held Sass' initial parole consideration hearing on November 25, 1996, and found him unsuitable for parole.

On March 25, 1999, the Board held a subsequent parole consideration hearing, and found Sass unsuitable for parole. The Board found that Sass "would pose an unreasonable risk of danger to others — to society and a threat to public safety if released from prison." The Board cited the "especially cruel manner" in which his offense was carried out, Sass' "escalating pattern of criminal conduct," and his "unstable social history with prior criminality" to support its unsuitability determination. Sass filed a petition for a writ of habeas corpus in California superior court, contending that the Board's failure to set a parole date violated his equal protection and due process rights. The court found that Sass had not exhausted his administrative remedies, and rejected Sass' argument that it would be futile to pursue administrative remedies because he exhausted his administrative appeals from the Board's 1996 unsuitability determination. Despite Sass' failure to exhaust administrative remedies, the court denied his habeas petition on the merits. The California Court of Appeals and the California Supreme Court also denied habeas petitions challenging the 1999 unsuitability determination.

On July 27, 2000, the Board held a third parole consideration hearing, and found Sass unsuitable for parole. The Board found that Sass "would pose an unreasonable risk of danger to society and a threat to public safety if released from prison." The Board cited the "total disregard for human suffering" demonstrated by the manner of his offense and Sass' previous criminal history to support its determination.[2] After

---

[2]Prior to his second degree murder conviction, Sass had been convicted on seven separate occasions for DUI.

pursuing an appeal to the Board, Sass filed a habeas petition in California superior court again alleging that the Board's failure to set a parole release date violated his equal protection and due process rights. The court found that the petition and supporting documentation failed to set forth sufficient facts to establish a prima facie case for relief, and denied the petition. The California Court of Appeals and the California Supreme Court also denied habeas petitions challenging the 2000 unsuitability determination.

Sass filed a petition for a writ of habeas corpus in the United States District Court for the Eastern District of California challenging the Board's 1996, 1999, and 2000 decisions denying him a parole date. On September 12, 2002, the district court held that the challenges to the 1996 parole proceeding were time-barred. The remaining matters were referred to a magistrate judge.

On March 16, 2005, the magistrate judge recommended that Sass' habeas petition be granted and that Sass be given a parole date within thirty days of the adoption of his findings. The magistrate judge's analysis relied on Ninth Circuit cases holding that California's statutory scheme gives prisoners a liberty interest in release on parole, *McQuillion v. Duncan*, 306 F.3d 895 (9th Cir. 2002), and that the Board's continued reliance on immutable factors to deny parole could result in a due process violation, *Biggs v. Terhune*, 334 F.3d 910, 917 (9th Cir. 2003). However, it should be noted that *Biggs* affirmed a denial of parole after holding that the circumstances of the offense and conduct prior to imprisonment constituted some evidence to support the Parole Board's decision. *Id.*

On June 15, 2005, the district court rejected the magistrate's findings and recommendations, and denied Sass' habeas petition. The district court held that the California Supreme Court had held in *In re Dannenberg*, 34 Cal. 4th 1061 (2005), that the language of California Penal Code sec-

tion 3041 is not mandatory. The district court therefore held that Sass did not have an associated liberty interest in parole under clearly established federal law.

On appeal, Sass argues that (1) section 3041 creates a liberty interest in parole and (2) the Board's decisions denying him parole violate his due process rights because they are not supported by some evidence.

II.

We review *de novo* a district court's decision to deny a 28 U.S.C. § 2254 habeas petition. *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004). Section 2254 "is the exclusive vehicle for a habeas petition by a state prisoner in custody pursuant to a state court judgment, even when the petitioner is not challenging his underlying state court conviction." *White v. Lambert*, 370 F.3d 1002, 1009-10 (9th Cir. 2004). Therefore, we review Sass' habeas petition under the deferential standard of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). The petition cannot be granted unless the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). When a state court does not explain its reasoning, as is the case here, we must conduct an independent review of the record to determine whether the state court's decision was objectively unreasonable. *Lewis v. Mayle*, 391 F.3d 989, 996 (9th Cir. 2004). Contrary to the dissent's assertion, we did conduct an independent review of the record.

III.

We analyze a due process claim in two steps. "[T]he first asks whether there exists a liberty or property interest which

has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989) (citation omitted).

**[1]** Did Sass have a constitutionally protected liberty interest in parole? The Supreme Court has held that "[t]here is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence," *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 7 (1979). However, if a state statute "uses mandatory language ('shall') to 'create a presumption that parole release will be granted' when the designated findings are made," the statute creates a liberty interest in parole. *Bd. of Pardons v. Allen*, 482 U.S. 369, 377-78 (1987) (quoting *Greenholtz*, 442 U.S. at 12).

**[2]** When previously confronted with the question whether section 3041 creates a liberty interest in parole, this court held that "[u]nder the 'clearly established' framework of *Greenholtz* and *Allen*, . . . California's parole scheme gives rise to a cognizable liberty interest in release on parole." *McQuillion v. Duncan*, 306 F.3d 895, 902 (2002). Furthermore, this "liberty interest is created, not upon the grant of a parole date, but upon the incarceration of the inmate." *Biggs v. Terhune*, 334 F.3d 910, 915 (2003).[3]

Sass argues that the district court erred when it interpreted *In re Dannenberg*, 34 Cal. 4th 1061 (2005), to hold that section 3041 does not use mandatory language and does not create a liberty interest in parole, thereby superceding *McQuillion* and *Biggs*. Because "a State's highest court is the

---

[3]Despite the government's argument that *Sandin v. Conner*, 515 U.S. 472 (1995), eliminated the "mandatory language" approach of *Greenholtz* and *Allen*, the Supreme Court did not so hold and this court has consistently rejected this argument. *See, e.g.*, *McQuillion*, 306 F.3d at 903; *Biggs*, 334 F.3d at 914.

final judicial arbiter of the meaning of state statutes," if the California Supreme Court did hold that section 3041 does not use mandatory language, this court's holdings to the contrary would no longer control. *Gurley v. Rhoden*, 421 U.S. 200, 208 (1975).

**[3]** The district court misread *Dannenberg*. *Dannenberg* addressed the narrow question whether the Board must engage in a comparative proportionality analysis in setting parole dates pursuant to section 3041(a) before determining whether an inmate is suitable for parole pursuant to section 3041(b). 34 Cal. 4th at 1077. *Dannenberg* held that "[n]othing in the statute states or suggests that the Board must evaluate the case under standards of term uniformity before exercising its authority to deny a parole date on the grounds the particular offender's criminality presents a *continuing public danger*." *Id.* at 1070.

**[4]** The California court did not hold that section 3041(b) does not use mandatory language. Dannenberg argued that "he was denied federal due process rights arising from his protected liberty interest, and expectation, in a 'uniform' parole release date." *Id.* at 1098 n.18. The court explained that "he has such a liberty interest and expectation only to the extent that state law provides it," but did not hold that state law does not provide such a liberty interest. *Id.* Instead, the court proceeded to the second step of the due process analysis - whether the procedures attendant upon a deprivation were constitutionally sufficient. *Id.* (rejecting Dannenberg's argument "that the Board's decision lacked the support of 'some evidence,' " and noting that he "does not contend he was denied any *procedural* rights he was constitutionally due in the course of the Board's decision") (citing *McQuillion* with approval). The court would not reach this step if it had held that there was no liberty interest. *See Ky. Dep't of Corr.*, 490 U.S. at 460. *Dannenberg* does not explicitly or implicitly hold that there is no constitutionally protected liberty interest in parole.

IV.

**[5]** Because we hold that Sass has a constitutionally pro-tected liberty interest in a parole date, we proceed to examine whether the deprivation of this interest, in this case, violated due process. *See Ky. Dep't of Corr.*, 490 U.S. at 460.

**[6]** In *Superintendent v. Hill*, the Supreme Court held that "revocation of good time does not comport with 'the mini-mum requirements of procedural due process,' unless the findings of the prison disciplinary board are supported by some evidence in the record." 472 U.S. 445, 454 (1985) (quoting *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974)). To determine whether the some evidence standard is met "does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board." *Id.* at 455-56. This court held that although *Hill* involved the accumulation of good time credits instead of a parole denial, the some evidence standard applies in both situations because "both directly affect the duration of the prison term." *Jancsek v. Or. Bd. of Parole*, 833 F.2d 1389, 1390 (9th Cir. 1987).

A.

The state contends that use of the some evidence standard in the parole context is not clearly established by the Supreme Court for AEDPA purposes. The Supreme Court has held that a state can create a liberty interest in parole, *Greenholtz*, 442 U.S. 1, *Allen*, 482 U.S. 369, and that a liberty interest cannot be interfered with unless the requirements of due process are satisfied, *Ky. Dep't of Corr.*, 490 U.S. 454. Although the Court has not specifically identified how these requirements are satisfied in the parole context, it follows from these prece-dents that due process must be satisfied.

**[7]** *Hill*'s some evidence standard is minimal, and assures that "the record is not so devoid of evidence that the findings of the disciplinary board were without support or otherwise arbitrary." *Hill*, 472 U.S. at 457. *Hill* held that although this standard might be insufficient in other circumstances, "[t]he fundamental fairness guaranteed by the Due Process Clause does not require courts to set aside decisions of prison administrators that have some basis in fact." *Id.* at 456. To hold that less than the some evidence standard is required would violate clearly established federal law because it would mean that a state could interfere with a liberty interest — that in parole — without support or in an otherwise arbitrary manner. We therefore reject the state's contention that the some evidence standard is not clearly established in the parole context.

B.

**[8]** In making a judgment call based on evidence of pre-conviction recidivism and the nature of the conviction offense, the Board cannot be categorized as acting arbitrarily. Here, the Board based its finding that Sass was unsuitable for parole on the gravity of his convicted offenses in combination with his prior offenses. These elements amount to some evidence to support the Board's determination. Sass contends that reliance on this immutable behavioral evidence violates due process. While upholding an unsuitability determination based on these same factors, we previously acknowledged that "continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and *could* result in a due process violation." *Biggs*, 334 F.3d at 917 (emphasis added). Under AEDPA it is not our function to speculate about how future parole hearings could proceed. *Cf. id.* The evidence of Sass' prior offenses and the gravity of his convicted offenses constitute some evidence to support the Board's decision. Consequently, the state court decisions upholding the denials were neither contrary to, nor did they involve an unreasonable application of, clearly

established Federal law as determined by the Supreme Court of the United States. 28 U.S.C. § 2254(d).

While the district court decision is correct under the AEDPA standard of review, we have pointed out that the district court based its decision on an erroneous reading of the California Supreme Court in *Dannenberg*. However, under the law of this circuit, "[w]e may affirm the district court's decision on any ground supported by the record, even if it differs from the district court's rationale." *Lambert v. Blodgett*, 393 F.3d 943, 965 (9th Cir. 2004).

AFFIRMED.

---

REINHARDT, Circuit Judge, dissenting:

I am compelled to dissent from the majority's refusal to grant relief to a person whose continued incarceration "runs contrary to the rehabilitative goals espoused by the prison system and *could* result in a due process violation," Maj. Op. at 10573 (quoting *Biggs v. Terhune*, 334 F.3d 910, 917 (9th Cir. 2003) (emphasis added)) — a person who is currently entitled to relief under any rational application of the law. The majority offers no reasoned explanation for this refusal, no doubt because its decision to deny relief finds no support in either law or logic.

Before I explain why the majority's decision is erroneous, it may be helpful if I set forth the nature of Brian Sass's offense and briefly identify the rules governing the California Parole Board's authority to grant or deny eligibility for parole in such cases. Sass was convicted of second degree murder as the result of a death he caused while driving under the influence of alcohol in July of 1987, and he was sentenced to fifteen years to life in prison.[1] After years of extensive and

---

[1]He had previously had seven DUI's but, inexplicably, had apparently never previously received a jail sentence.

successful participation in alcohol rehabilitation programs, his prior state of active alcoholism is now as "cured" as such an ailment can ever be, and he possesses an essentially unblemished record of conduct in prison.[2] These facts notwithstanding, he has thrice[3] been denied parole.[4] The California rules governing parole in murder cases, for which parole eligibility is provided by statute,[5] are as follows. "[P]arole eligibility is the rule, rather than the exception."[6] "[P]arole is 'normally' to be granted."[7] The murder giving rise to the prisoner's incarceration must be "particularly egregious" for parole to be denied.[8] Indeed, a murder must be "heinous, atrocious or cruel" if, as here, the offense is to serve as the basis for parole denial.[9] In addition, in such cases, the prisoner must *presently* present a danger to society.[10] In short, in Sass's case, the circumstances surrounding the crime or the manner in which it

---

[2]Sass had only two minor disciplinary notices on his record as of 2000. Once he spoke too loudly on the telephone and once he participated in a work stoppage. The most recent of the notices was six years before the 2000 parole hearing.

[3]Sass was denied parole in 1996, 1999, and 2000. He challenges the results of both the 1999 and 2000 parole proceedings. Because Sass is entitled to the relief he seeks if he prevails on either challenge and because I conclude that he is entitled to prevail on both, essentially for the same reasons, I will discuss only the 2000 denial, the more recent of the two.

[4]The supplemental record reflects that the Parole Board has persisted in its unlawful course of conduct in the time since its denial of Sass's petition in 2000. The most recent denial occurred in February of 2006. The Board will not hear his application again until an as yet undetermined date in 2008.

[5]*See* 15 Cal. Code Regs. § 2402. California also has two categories of murders for which parole is not permissible. One involves life without the possibility of parole (L.W.O.P.). The other involves death-eligible murders for which capital punishment may be imposed.

[6]*In re Scott,* 119 Cal. App. 4th 871, 891 (2004).

[7]*Id.* (quoting Cal. Pen. Code § 3041(a)).

[8]*In re Rozenkrantz*, 29 Cal. 4th 616, 683 (2002).

[9]15 Cal. Code Regs. § 2402(c)(1).

[10]Cal. Pen. Code § 3041(b).

was committed must show not only that the second degree murder at issue was more cruel or vicious than the ordinary second degree murder,[11] but also that Sass would likely pose a current risk to public safety if released. The record in this case contains absolutely *no* evidence that would meet *either* of the two requirements. Thus, there can be little doubt that the Board violated the applicable rules when it denied Sass parole solely on the basis of his commitment offense and pre-offense conduct.

Turning to the majority's brief opinion, ninety-plus percent of it is correct. The initial forty-five percent constitutes an accurate recitation of the facts. The next forty-five plus percent generally describes the applicable law correctly and properly rejects the state's basic legal positions that: (1) there is no liberty interest in parole, and (2) the legal standard for reviewing parole decisions is not clearly established. It is only in its next-to-last paragraph that the majority summarily discusses Brian Sass's case[12] and, in the last two sentences of that paragraph, dismisses his constitutional claim on the ground that "[t]he evidence of Sass' prior offenses and the gravity of his convicted offenses constitute some evidence to support the Board's decision," and therefore "the state court decisions upholding the denials were neither contrary to, nor did they involve an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the

---

[11]It could be argued that in order to deny parole suitability on the basis of the nature of the offense, the second degree murder involved must be more cruel or vicious than the average murder, first or second degree, rather than simply the average second degree murder. It is not necessary for us to consider that argument, however, as the drunk driving offense that caused the victim's death was, as I will show, less not more, egregious than the run-of-the-mill second degree murder.

[12]The last paragraph merely repeats, unnecessarily, a well established and uncontroverted legal proposition regarding the power of the courts of appeal to affirm a district court's decision on any ground supported in the record, a proposition hardly deserving of constituting the conclusion to this exercise in judicial abdication of responsibilities.

United States." Maj. Op. at 10573-74. It is from this unsupported and unsupportable conclusion of the majority that I must dissent.

The cursory nature of the majority's treatment of the central issue in this case is startling. The majority offers no explanation as to why it finds that either Sass's pre-offense conduct or commitment offense constitutes some evidence that he is presently a danger to society, nor does it explain why the second degree murder he committed was particularly egregious in comparison to other second degree murders. The failure to provide *any* rationale for its conclusion is particularly striking, given that it follows by only two sentences a quotation from a recent case of ours, decided under AEDPA, that says that reliance on a prisoner's offense and on his pre-offense conduct to deny parole can in some instances constitute a due process violation. Maj. Op. at 10573 (quoting *Biggs*, 334 F.3d at 917). The majority makes no attempt to explain why reliance on these factors in this case was proper and did not violate Sass's right to due process. Indeed, the majority merely cites *Biggs* and then blithely ignores it.

Even a cursory review of the record in this case demonstrates that the state court's decision was unreasonable under the applicable "some evidence" rule. The record simply does not contain *any* evidence that Sass's act of second degree murder was, in contrast to the large majority of such offenses, *particularly* egregious. Nor does it contain *any* evidence that Sass is currently a threat to society. Given that both findings are required by California law, *see* Section II.B.(1) *infra*, there is *zero* evidence in the record to support the Board's decision. Although the majority says that it "conduct[ed] an independent review of the record" in light of the fact that the state court did not explain its reason for denying relief, Maj. Op. at 10569, it appears not to have done so. At least, if it did review the record, it keeps its results a secret. Indeed, it points to not a scrap of evidence in the record for *any* purpose, and instead merely declares, without any analysis or explanation,

that the offense of which Sass was convicted and his prior conduct constitute "some evidence." Maj. Op. at 10573. Whether Sass's particular offense and his particular conduct can provide "some evidence," under California law and the United States Constitution, is, of course, the legal issue in this case. It is not an acceptable answer simply to say, as the majority does, without *any* explanation at all, "they do."

The majority's summary dismissal of Sass's constitutional arguments has particularly unfortunate consequences. The fact that Sass's offense and prior DUI's, in and of themselves, are held to be enough to justify his present detention necessarily means that they are enough to justify his detention indefinitely, regardless of the majority's protestations as to what it is actually deciding. Maj. Op. at 10573. Under today's opinion, the Board may treat all recovering alcoholics as a permanent danger to society, regardless of their level of recovery and of the state of their rehabilitation generally, and thus deny *all* such individuals parole eligibility for the remainder of their lives, no matter how deserving of release they may be. The policy that the majority declines to overturn is not only ignorant and cruel, but unconstitutional, a point that the majority does not deign to discuss.

## I.

It is worth noting at the outset that the issue before us is whether Brian Sass is *suitable* for parole, not *when* he should be released. Under the California parole system, the Board's initial task with respect to an inmate serving an indeterminate sentence is to determine whether he is suitable for parole — that is, whether he "pose[s] an unreasonable risk of danger to society if released from prison." 15 Cal. Code Regs. § 2402.[13]

---

[13]The regulations governing the parole process provide six nonexclusive factors tending to show unsuitability for parole and nine nonexclusive factors tending to show suitability. The factors tending to show unsuitability are: (1) Commitment Offense; (2) Previous Record of Violence; (3) Unsta-

Only after the Board deems an inmate suitable is a release date set. 15 Cal. Code Regs. § 2282; *see also In re Dannenberg*, 34 Cal. 4th 1061, 1071 (2005) ("[A] determination of individual suitability must precede the setting of a . . . parole release date."). The actual parole release date may well be a number of years in the future. Under Board regulations, the parole date is established using a matrix that takes into account the inmate's offense of imprisonment and the circumstances in which it was committed. 15 Cal. Code Regs. § 2282. The matrix is intended to ensure sentencing uniformity among those who commit similar crimes. *See Dannenberg*, 34 Cal. 4th at 1078-79. Such considerations are, of course, inapplicable in the case of prisoners deemed unsuitable for parole. *Id.* at 1080.

In the 2000 determination challenged by Sass in his habeas petition, the Board deemed him unsuitable for parole. Thus, a writ would simply require that the Board set a parole date for him pursuant to the procedures set forth in its regulations.

## II.

### A.

The majority is correct that Sass's petition is governed by AEDPA and that we therefore may not grant the relief he seeks unless the state court decisions that he challenges are

───────────────

ble Social History; (4) Sadistic Sexual Offenses; (5) Psychological Factors; and (6) Institutional Behavior. 15 Cal. Code Regs. § 2402(c). In terms of the first factor, "Commitment Offense," the regulations explain that it tends to show unsuitability when "[t]he prisoner committed the offense in an especially heinous, atrocious or cruel manner." *Id.* at § 2402(c)(1). The factors indicating suitability for parole are: (1) No Juvenile Record; (2) Stable Social History; (3) Signs of Remorse; (4) Motivation for the Crime; (5) Battered Woman Syndrome; (6) Lack of Criminal History; (7) Age; (8) Understanding and Plans for the Future; and (9) Institutional Behavior. 15 Cal. Code Regs. § 2402(d).

"contrary to, or involve[ ] an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). AEDPA limits the source of clearly established federal law to Supreme Court precedent, including the legal principles that flow from that precedent. *Id.*; *Cooper-Smith v. Palmateer*, 397 F.3d 1236, 1242 (9th Cir. 2005). Here, the majority and I agree that, unlike in so many AEDPA cases, the controlling United States Supreme Court law is clearly established: A parole board's decision, like a prison disciplinary board's decision, deprives a prisoner of due process if it is not supported by "some evidence" *or* is "otherwise arbitrary." *Hill*, 472 U.S. at 457; *see McQuillion v. Duncan*, 306 F.3d 895, 904 (9th Cir. 2002) (I sometimes refer to this as the "some evidence" rule and sometimes the "*Hill*" rule.). If a state court's decision that a parole board's determination *is* both supported by "some evidence" and *not* "otherwise arbitrary" constitutes an unreasonable application of *Hill*, the court decision must be reversed under AEDPA and the writ must be granted. Although the majority recognizes that the Supreme Court has clearly established that the "some evidence" rule applies in the parole context, Maj. Op. at 10572-73, it provides no explanation of how the Board's determination in this case satisfies the "some evidence" portion of the *Hill* rule, and it does not even acknowledge the "otherwise arbitrary" portion of the rule.

The majority correctly notes that we must conduct an independent review of the record to determine whether the state court decision rejecting Sass's challenge to the Board's denial of parole suitability in 2000 constitutes an objectively unreasonable application of federal law. Maj. Op. at 10569. In ratifying the Board's determination, the state court did not offer any indication of the basis for its decision. The only explanation it provided is: "The petition and supporting documentation fail to set forth sufficient facts to establish a prima facie case for the relief requested, as required by law." This is

plainly inadequate to allow us to evaluate the decision.[14] In that circumstance, "an independent review of the record is required to determine whether the state court clearly erred in its application of controlling federal law. Only by that examination may we determine whether the state court's decision was objectively reasonable." *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000) (internal citation omitted); *see also Pham v. Terhune*, 400 F.3d 740, 742 (9th Cir. 2005); *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003); *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002) ("We have relaxed AEDPA's strict standard of review when the state court reaches a decision on the merits but provides no reasoning to support its conclusion.").

As noted above, although the majority states that it independently reviewed the record, Maj. Op. at 10569, there is no hint in its opinion that it actually did so. It fails to apply *Hill*'s "some evidence" test to the facts of this case, merely stating by way of unsupported conclusion that "Sass' prior offenses and the gravity of his convicted offenses constitute some evidence to support the Board's decision." Maj. Op. at 10573. It reaches this conclusion without any analysis, legal or factual, of the contents of the record, and without any explanation as to how the evidence can satisfy the *Hill* standard or why it does. Why, for example, does this particular conviction constitute "some evidence" that Sass presently constitutes a danger to society? Why is this offense "particularly grave"? How can *this* offense be deemed particularly "heinous, atrocious, or cruel" relative to other second degree murders? And why is the state court decision not "arbitrary"? As I have mentioned earlier and will discuss further later, not all second degree murder convictions *can* constitute "some evidence" under California's parole system; to the contrary, only a small number do.

---

[14]The decision we review is that of the trial court. The state appeals court and state supreme court both simply denied Sass's petition without explanation.

Even the most perfunctory review of the Board's determination in 2000, and the rationale it offers to justify it, reveals that its decision is not supported by "some evidence" *and* that it is "otherwise arbitrary." Had the majority truly conducted an independent analysis of the record, it would have had no choice but to conclude that the state court decision constitutes an unreasonable application of *Hill*. It also would have been required to undertake the task of explaining what in the record makes Sass's conviction such as to warrant the conclusion that, regardless of the extent of his rehabilitation, he remains, indefinitely, unsuitable for parole, or what in the record justifies singling out Sass's case from the vast majority in which individuals who have been convicted of second degree murder become eligible for an early parole date in the absence of prison conduct that demonstrates a lack of suitability. In other words, it would have had to explain what evidence in the record supports a conclusion that Sass's offense was "particularly egregious" and "heinous, atrocious, or cruel." Because the majority fails to do so, I will now undertake the requisite *Hill* analysis as prescribed by AEDPA.

## B.

As the outset, it is important to recall that the majority does not discuss a critical question underlying Sass's case — whether past active alcoholism may provide a basis for indefinite denial of parole, regardless of the extent of the individual's recovery and of his general rehabilitation. That it may (and that it does in this case) is the necessary premise of the majority's holding that Sass's prior conviction and earlier drunk driving offenses constitute "some evidence" that he is unsuitable for the setting of a parole eligibility date. I do not think that we can in good conscience pretend that the unmentioned elephant is not with us.

(1)

The majority acknowledges that the only factually-supported reasons relied upon by the Board in its 2000 suitability determination were Sass's offense of imprisonment and his earlier DUI record. It fails to note, however, that the mere fact of a conviction for second degree murder does not in and of itself constitute "some evidence" of unsuitability for parole. Under California law, the Board may not deny an inmate parole solely on the basis that he was convicted of second degree murder. Rather, the murder must have been committed in a manner that is "heinous, atrocious or cruel" for it to constitute "some evidence" that an inmate is unsuitable for parole. 15 Cal. Code Regs. § 2402(c)(1). The California courts have explained that "[a] conviction for murder does not automatically render one unsuitable for parole. Rather, the Regulations reveal that the gravity of an offense tends to show unsuitability where the circumstances of the crime distinguish it as *especially grave*." *In re Smith*, 114 Cal. App. 4th 343, 366 (2003) (emphasis added) (internal citation omitted); *see also In re Rosenkrantz*, 29 Cal. 4th 616, 683 (2002) ("[A] life term offense or any other offenses underlying an indeterminate sentence must be *particularly egregious* to justify the denial of a parole date."); *In re Scott*, 119 Cal. App. 4th 871, 891 (2004) (emphasis added) ("[P]arole is the rule, rather than the exception, and a conviction for second degree murder does not automatically render one unsuitable."). This is because "the [California] Legislature has clearly expressed its intent that when murderers—who are the great majority of inmates serving indeterminate sentences—approach their minimum eligible parole date, the Board 'shall normally set a parole release date.' The Board's authority to make an exception based on the gravity of a life term inmate's current or past offenses should not operate so as to swallow the rule that parole is 'normally' to be granted." *Id.* (quoting Cal. Pen. Code. § 3041(a)). Moreover, where, as here, the gravity of the offense is the sole basis for a determination of unsuitability, that gravity must also demonstrate that at the time of the hearing the inmate poses a *present* danger to society. *See* Cal. Pen. Code. § 3041; *In re Dannenberg*, 34 Cal. 4th at 1096. In sum,

*the circumstances surrounding the crime or the manner in which it was committed must show not only that the second degree murder at issue is more callous, cruel or vicious than the ordinary second degree murder, but that the inmate would likely pose a current risk to public safety if released.* Otherwise, the Board cannot find him unsuitable for parole on the basis of the gravity of the offense of imprisonment.[15]

When we assess whether a state parole board's suitability determination is supported by "some evidence" in a habeas case, our analysis is framed by state law. The statute and regulations governing parole suitability determinations in a particular state dictate what factors the parole board in that state may consider in deciding whether an inmate is suitable for parole. In other words, the state rules and regulations dictate the nature of the findings that are required before a determination can be made that an inmate is unsuitable for parole. Only evidence that would tend to support such findings constitutes "some evidence." Thus, although federal law establishes the "some evidence" standard, state law tells us of what that evidence may consist, and to what it must pertain. Here, as I have explained, the California statute and regulations provide that an offense must be committed in an exceptionally callous or particularly egregious manner for an inmate's offense to justify a determination that he is unsuitable for parole. Also, the inmate must constitute a present danger to society at the time of the suitability hearing. Accordingly, as a habeas court, we must look to whether there is "some evidence" that Sass committed his offense of imprisonment in a manner that distinguishes it from the vast majority of second degree murders, that shows that Sass's offense was more "heinous, atrocious, or cruel" than most other such offenses. We must also look to see that there is some evidence that as of the date of Sass's parole denial he was a present danger to society.

---

[15]Of course, the Board can find an inmate unsuitable for parole on the basis of factors having nothing to do with the offense of commitment, such as his violent institutional behavior or demonstrated inability to adjust to societal norms. *See supra* note 13.

The majority cites the "gravity" of the offense but offers not a word as to what makes the offense grave, let alone more grave than the run-of-the-mill second degree murder. It also fails to offer a clue as to what it is that makes Sass a current threat to public safety. The state court ruling suffers from the same defects.[16] From my independent review of the record, however, and specifically the Board's decision and the transcript of the parole hearing, it is plain that the only factor that could even arguably provide a basis for a finding that the offense was particularly grave or that Sass poses a present danger to society is his active alcoholism at the time of the criminal offense — the factor that caused him to commit the crime for which he is imprisoned.[17]

---

[16]Both state court rulings, like the majority's ruling, also fail to acknowledge that the record before the Board contained extensive evidence of Sass's exemplary conduct in prison and his detailed plans for the future if released — evidence that is highly probative of the fact that Sass presented no present threat to society at the time of the 2000 hearing. Sass's conduct in prison and the activities he participated in while an inmate "indicat[ed] an enhanced ability to function within the law upon release," and allowed him to develop "marketable skills that can be put to use upon release," two factors that tend to show suitability for parole under the California regulations. *See* 15 Cal. Code Regs. § 2402(d)(8), (9). As discussed above, the record considered by the Board in 2000 demonstrated that Sass's conduct in prison was essentially without fault. Furthermore, by the time of the 2000 hearing, Sass had completed vocational automobile mechanics, received numerous certificates relating to particular vocational skills he mastered, passed the Automotive Service Excellence (ASE) test, and served as an apprentice. He also had taken almost two and a half years worth of college classes, for which he received all A's except for one B minus. This evidence also offers strong affirmative support for Sass's contention that he was not a present threat to public safety at the time of the 2000 proceeding and thus that he was suitable for parole eligibility at that point.

[17]The prior DUIs on which the Board and the majority also rely are simply manifestations of the same alcoholism and thus do not constitute an independent factor on which to judge the egregiousness of Sass's offense or especially his present dangerousness. Accordingly, I do not consider them separately from the circumstances of his offense of imprisonment. They are relevant to that offense, however, in that it was only the prior DUIs that allowed the jury to convict Sass of second degree murder instead of vehicular manslaughter. Yet, even with the DUIs, Sass's offense barely qualifies as a second degree murder, and not as a particularly egregious such offense.

The regulations governing the parole process specifically identify five factors to be considered in determining whether the manner in which the inmate committed his offense of imprisonment is so egregious as to demonstrate unsuitability for parole. Those factors include that: "The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering."; "Multiple victims were attacked, injured or killed in the same or separate incidents."; "The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder."; "The victim was abused, defiled or mutilated during or after the offense."; and "The motive for the crime is inexplicable or very trivial in relation to the offense." 15 Cal. Code Regs. § 2402(c)(1)(A)-(E). The only one of these factors that the Board relied upon in making its 2000 suitability determination provides that an offense is considered especially egregious when it "was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering." 15 Cal. Code Regs. § 2402(c)(1)(D). The Board held that because Sass committed the crime as a result of driving a vehicle under the influence, "[t]he offense was carried out in a manner which demonstrates a total disregard for human suffering." This conclusion is not supported by "some evidence," and is clearly arbitrary. *See* Section II.B.(2), *infra.* Similarly, a conclusion that a crime committed by a then active alcoholic acting under the influence of alcohol over a decade earlier (now almost a generation earlier) in and of itself demonstrates that an individual currently poses a threat to public safety would be without support in the evidence and "otherwise arbitrary."

## (2)

That Sass committed his offense of imprisonment due to his alcoholism simply does not constitute "some evidence" that his offense "was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering," and it certainly does not show that his offense was carried out in a manner that is more callous than most second

degree murders. Sass's conduct — committing the crime under the influence of alcohol — does not even begin to approach the examples offered in the parole regulations of conduct which constitutes "exceptionally callous disregard for human suffering." Those examples include:

> "[T]orture," as where the "[v]ictim was subjected to the prolonged infliction of physical pain through the use of non-deadly force prior to act resulting in death," and "severe trauma," as where "[d]eath resulted from severe trauma inflicted with deadly intensity; e.g., beating, clubbing, stabbing, strangulation, suffocation, burning, multiple wounds inflicted with a weapon not resulting in immediate death or actions calculated to induce terror in the victim."

*In re Scott*, 119 Cal. App. 4th at 892 (quoting 15 Cal. Code Regs. § 2282). The type of criminal conduct that is sufficiently callous to meet this high standard is illustrated in *In re Van Houten*, 116 Cal. App. 4th 339 (2004). There, the inmate's offense of imprisonment was her involvement in the stabbing murders of a husband and wife. The victims were stabbed multiple times with a knife, bayonet, and carving fork. *Id.* at 351. The court noted that the husband's death was "peculiarly cruel, stabbed with a knife through his throat and a carving fork plunged in his stomach," and that "[a] particularly poignant cruelty was inflicted on [the wife], who struggled for her life while hearing her husband meet his gruesome fate." *Id.* The fact that Sass committed his crime as a result of his addiction to alcohol, although undoubtedly regrettable, does not suggest that he is possessed of a similar streak of extreme callousness or cruelty.

As a California court recently explained in rejecting a determination that an inmate committed a crime with callous disregard for the victim's suffering:

> There is no evidence that [the inmate] acted with cold, calculated, dispassion; or that he tormented,

terrorized, or injured [the victim] before deciding to shoot her; or that he gratuitously increased or unnecessarily prolonged her pain and suffering. . . . Was the crime callous? Yes. However, are the facts of the crime some evidence that [the inmate] acted with exceptionally callous disregard for [the victim's] suffering; or do the facts distinguish this crime from other second degree murders as exceptionally callous? No.

*In re Smith*, 114 Cal. App. 4th at 367.

The exact same analysis is applicable in Sass's case. The manner in which he committed his offense (i.e., under the influence of alcohol) did not reflect calculation or dispassion. Rather, it was a manifestation of his addiction to alcohol, an addiction that profoundly impaired his judgment. His addiction certainly does not relieve him of criminal responsibility, but it does demonstrate that his crime was not one of cold calculation, dispassion, or extreme callousness. Sass did not torment or torture the victim before killing her, nor he did prolong her pain or suffering unnecessarily. In other words, although some might term his criminal act callous because he committed it while under the influence of alcohol, Sass's alcoholism simply does not render the offense *exceptionally* callous, and certainly not more callous than most second degree murders — if indeed an act committed as a result of alcoholism can be called "callous" (rather than "compulsive") at all. Accordingly, under California law, Sass's offense of imprisonment does not constitute "some evidence" that he is unsuitable for parole.

(3)

Even if Sass's alcoholism had made his offense egregious at the time it was committed, whether on the basis of extreme "callousness" or one of the other factors listed in the parole regulations, it would not constitute "some evidence" that he

was a *current* danger to public safety in 2000. Under California Penal Code § 3041 and 15 California Code of Regulations § 2402, parole eligibility may not be denied unless the record shows that the petitioner presents a danger to society at the time of his parole hearing. *See In re Dannenberg*, 34 Cal. 4th at 1071 (holding a denial of parole suitability based on "the crime for which the inmate was committed" requires that the Board conclude that "the particular facts of the offense make it unsafe, *at that time*, to fix a date for the prisoner's release") (emphasis added) (citing Cal. Penal Code § 3041); *see also id.* at 1080 (explaining that under 15 Cal. Code Regs. § 2402(a) the suitability inquiry requires the Board to determine whether "the circumstances of a particular murder persuade [it] that the prisoner who committed it is *presently* too dangerous to grant a fixed parole release date").

In the context of assessing *present* dangerousness, alcoholism is analogous to a mental disorder: To demonstrate that an individual who committed a crime due to such a disorder constitutes a present danger, it is not enough for the Board to conclude that the inmate suffered from the disorder at the time of the offense. Rather, it must be shown that at the point that his suitability for parole is determined, the inmate still suffers from the disorder to the extent that he remains a present danger. Specifically, the Board cannot establish that a recovering alcoholic is a present danger to society on the basis of the fact he *was* an active alcoholic at the time of his offense; instead, it must show that he *is* an active alcoholic at the time of the suitability determination, or that he is likely to fall off the wagon if released.

The Board did not rely on any evidence that Sass was an active alcoholic in 2000 or that he was likely to resume drinking, and indeed it could not have done so, because, by that point, Sass had unquestionably demonstrated that he was as recovered from his alcoholism as it is possible for an individual to be. There is not a scintilla of evidence in the record that suggests that he would be likely to resume drinking if he was

released. It is undisputed that prior to entering prison Sass had an alcohol abuse problem that he refused to acknowledge and for which he refused to seek treatment. However, while incarcerated, Sass has taken all possible steps to address and overcome his alcoholism. He has participated in Alcoholics Anonymous ("AA") since January 1992, the earliest time at which he could enroll in the program, given his custody status, and has proven his dedication to sobriety and his ability to resist temptation. As the record before the Board shows, the doctors who treated Sass explained that he had recovered to the greatest extent possible for an alcoholic and that he had been in that state of recovery for many years. By 2000, there was nothing more that Sass could do while in prison to change his situation with respect to his alcoholism.[18]

In light of Sass's circumstances, it is not surprising that in explaining its decision in 2000 that he was not suitable for parole, the Board failed to cite *any* evidence that Sass would have been more likely to relapse twelve years after he had last abused alcohol than had he appeared before it in another five, ten, twenty, or even fifty years hence. Indeed, all the evidence available to the Board in 2000 was to the effect that he had successfully pursued all measures available to ensure that he would not again lapse into alcoholic behavior.[19] With respect

---

[18]The psychologist's 2005 assessment, expressly based on the prior psychological evaluations and using language that echoes that contained in the previous reports, stated that although "[r]elapsing in the use of alcohol is always a possibility . . . this individual has taken care of this problem by his positive programming and being in treatment for this problem, having a sponsor in the community, and lots of support." Similarly a 2002 assessment, also invoking language similar to that used in prior reports presented to the Board, stated that Sass "is no more a danger to other people than any other parolee who is actively involved in their recovery of themselves and whatever addiction they may have."

[19]The record before the Parole Board in 2000 not only contained evidence regarding Sass's longstanding participation in AA, it also reflected his participation in numerous other self-help classes. The Board itself characterized his involvement with these classes as "extensive" and the list

to its 2000 decision (and its decision the previous year), there was *no* evidence to the contrary before the Board — no evidence suggesting that Sass's maximally treated alcoholism left him a current danger to society, that concerns of public safety required a lengthier period of incarceration, or that, even if he remained in prison indefinitely, there were any further steps he could take or treatment he could undergo that would render him more suitable for parole. In sum, the record is barren of *any* testimony, report, study, or other facts that suggest that Sass was more dangerous in 2000, over a decade after the deadly accident, than any other person who has ever been an active alcoholic, or than any previously law-abiding member of society.[20]

As a result, not only is it clear that the manner in which Sass committed his crime could not *ever* have constituted evidence that would justify labeling his offense "exceptionally egregious," it is equally clear that his conduct in 1987 could not provide any evidence that he was a *current* danger to society at the time of his 2000 parole hearing. The Board's unexplained conclusion to the contrary is without evidentiary support and is entirely belied by the record before us. Besides his alcoholism, the Board offered no other evidence that suggests that Sass was a danger to society in 2000. Accordingly,

---

of classes he had attended as "very very long." In addition, the Board had before it evidence of the detailed plans that Sass had made for maintaining his recovery when released from prison. He submitted letters showing that he had been accepted to two consecutive 90-day substance abuse treatment programs that he would attend upon his release, and he identified the individual who would serve as his AA sponsor when he left prison. Furthermore, Sass explained to the Board that, in addition to his work with AA, he would also attend meetings of his religious group five days a week, meetings that would also help him maintain his recovery.

[20]There is also no evidence that Sass is any more dangerous now, over nineteen years after he last consumed alcohol, than any other recovering alcoholic; yet, according to the supplemental record, the Board has continued to rely solely on his alcoholism to refuse repeatedly to set a date for his parole in the 6 years since 2000.

the state court's decision affirming the Board's suitability determination is, without question, an unreasonable application of the "some evidence" portion of the *Hill* rule.

Regrettably, the majority refused to undertake the legal analysis that would have unquestionably led it to the conclusion that Sass is being held in prison unconstitutionally. It refused to do so because it ignored the admonition of the California Court of Appeals that "[t]he exceedingly deferential nature of the 'some evidence' standard of judicial review . . . does not convert a court reviewing the denial of parole into a potted plant." *In re Scott*, 119 Cal. App. 4th at 898 (internal citation omitted). In doing so, it has abdicated its responsibility as a habeas court.

(4)

The Board's suitability determination has highly disturbing implications for Sass's future and the future of all other recovering alcoholics who are imprisoned for crimes they committed as a result of their alcoholism. Because the record before the Board in 2000 offered no evidence that Sass's alcoholism made him a current public safety threat, and because there was nothing more that Sass could have done in 2000 to further perfect his recovery, the Board's rationale for denying him suitability for parole suggests that he and all formerly active alcoholics may be denied parole for the rest of their lives. In short, if the fact that Sass had been an active alcoholic in 1987 constituted "some evidence" that he was a threat to public safety in 2000, even though he was at that point as recovered as it is possible for an alcoholic to be, his past active alcoholism would necessarily constitute "some evidence" of his unsuitability for parole in perpetuity, and thus provide a constitutional basis for the permanent denial of his freedom. The same would be true in the case of all other former alcoholics. That this is not just speculation is borne out by the supplemental record and the Board's continuing deni-

als to Sass of parole eligibility on the same ground.[21] The Board's refusal to set a parole date the basis it did is egregiously wrong. I hope that some time soon the Board will come to realize that neither the Constitution nor the California parole system permits an inmate to be denied parole solely on the basis of a mental or addictive condition that existed at the time of the crime. Under the Due Process Clause, the prior condition cannot, without more, constitute evidence of present dangerousness.[22]

## C.

An independent review of the record also reveals that the Board's determination is "otherwise arbitrary" in at least two respects, and that the state court decision ratifying it constitutes an unreasonable application of that part of the *Hill* rule.

First, the Board's decision impermissibly punishes Sass on the basis of his status as a formerly active alcoholic. As discussed above, the rationale employed by the Board and approved by the state court would allow the Board to deny parole to any person who was once an active alcoholic, regardless of the extent of his rehabilitation. To permanently deprive Sass, or any other inmate, his liberty simply because he was an active alcoholic at the time of the offense, and alcoholics are deemed to be in a perpetual state of recovery, is an untenable result. It is also a violation of due process. The Supreme Court has made clear that an individual cannot be punished on the basis of status alone, including the status of being afflicted with an addiction, *see Robinson v. California*,

---

[21]The latest report from the Board indicates that in February of 2006 it preliminarily denied Sass parole for another two years, at least until a hearing is held sometime in 2008.

[22]*See Robinson v. California*, 370 U.S. 660 (1962) (holding that the Constitution prohibits the punishment of an individual solely on the basis of his status, including the status of suffering from addiction); Cal. Penal Code § 3041(b) (requiring a parole date to be set unless the Board finds an inmate poses a current threat to public safety).

370 U.S. 660 (1962); yet that is precisely what the Board's practice, at least as applied in Sass's case, does. Sass has finished serving the sentence he would have served but for the Board's finding of present dangerousness — a finding based solely on the fact that many years earlier he committed a crime as a result of his state of active alcoholism. That finding constitutes a quintessentially arbitrary state action — it relies solely on the biases of the Board, rather than on any objective justifications, and it permits the permanent imprisonment of Sass solely for the reason that he was once an active alcoholic. In light of *Robinson*, the Board's 2000 decision, which depends entirely on Sass's status as an alcoholic, is without any constitutionally cognizable evidentiary support.

Second, even if an inmate's active addiction to alcohol at the time of the offense could provide a basis for an adverse suitability determination in cases in which the record contains "some evidence" that the prisoner presently presents a danger to society, that is not the case with Sass. The record is devoid of any evidence that supports the Board's finding that Sass, well over a decade after he last abused alcohol, constitutes a present threat to society. The Board's decision relies exclusively on the fact that Sass was an active alcoholic at the time of his offense of imprisonment and on his prior DUIs. Beyond that, it offers no evidence — not a single action on Sass's part since his imprisonment, not a medical or psychological report discussing the dangerousness of recidivism amongst recovering alcoholics generally or of Sass specifically — to support its conclusion that Sass was, at the time of the parole hearing, a danger to public safety. The Board's failure to offer *any* evidence linking Sass's past active alcoholism to a state of present dangerousness renders its decision completely without support and thus "arbitrary." Indeed, there is simply nothing in the record that provides any evidence that Sass is unsuitable for parole.[23]

---

[23]In addition, the Board apparently ignored totally the affirmative evidence in the record to the contrary — evidence that irrefutably demonstrated that Sass did *not* present a present danger to society. *See supra* notes 17, 19, and 20.

Because status as an alcoholic alone cannot constitute the basis for determining that an inmate is unsuitable for parole, and because the record here is completely devoid of any evidence showing that Sass's active alcoholism numerous years ago makes him a present threat to public safety, the Board's suitability decision, which depended entirely on Sass's alcoholism, is "arbitrary." Because the state court decision likewise is wholly without evidentiary support and because it validates a Parole Board decision based on bias and addictive status, it constitutes an unreasonable application of the clearly established "otherwise arbitrary" part of *Hill*.

## CONCLUSION

The majority considers none of the legal or factual issues necessary to resolve the important constitutional issue before us. As a result, it reaches the unprecedented and erroneous conclusion that the commission of an offense resulting from alcoholism many years earlier can serve, without more, as "some evidence" that an individual who has reached the maximum state of recovery an alcoholic can achieve, presents a current danger to society. Moreover, my colleagues fail to explain why Sass's offense was more grievous than the vast majority of second degree murders, apparently because they do not recognize that in order to find a prisoner unsuitable for parole, his offense must have been more callous, cruel or vicious than the ordinary second degree murder. In fact, the majority fails in all respects to point to anything in the record that would support its decision or explain its reasoning.

As did the California courts before it, the majority fails to apply the controlling rules and standards governing parole eligibility in making its determination that "some evidence" supports the Parole Board's decision. Further, the majority's decision, like the California courts', constitutes an unreasonable application of clearly established Supreme Court law. Regretfully, I conclude that what the majority has produced is a decision without a rational foundation or a legal justifica-

tion. I firmly believe that one day my colleagues, who are both able jurists, will come to recognize and regret the erroneousness of their decision and the injustice it perpetuates.

I respectfully dissent.