Darlene BRAZIL, Petitioner,

v.

Dawn DAVISON, Warden, Respondent.

Case No. CV 06–5708–SJO (JWJ).

United States District Court,
C.D. California,
Western Division.

July 25, 2009.

Roger S. Hanson, Roger S. Hanson Law Offices, Santa Ana, CA, for Petitioner.

J. Conrad Schroeder, CAAG—Office of the Attorney General of California, Los Angeles, CA, for Respondent.

### ORDER ADOPTING REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

S. JAMES OTERO, District Judge.

Pursuant to 28 U.S.C. § 636(b)(1)(C), the Court has reviewed the Petition for Writ of Habeas Corpus and other papers along with the attached Report and Recommendation of the United States Magistrate Judge, and has made a *de novo* determination of the Report and Recommendation. Further, the Court has engaged in a de novo review of those portions of the Report to which Petitioner has objected.

IT IS ORDERED that a Judgment be issued dismissing the instant Petition for Writ of Habeas Corpus with prejudice.

IT IS FURTHER ORDERED that the Clerk shall serve forthwith a copy of this Order and the Judgment of this date on the petitioner and counsel for respondent.

### REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

JEFFREY W. JOHNSON, United States Magistrate Judge.

This Report and Recommendation is submitted to the Honorable S. James Otero, pursuant to 28 U.S.C. § 636 and General Order No. 05–07 of the United States District Court for the Central District of California. For the reasons discussed below, it is recommended that the Petition for Writ of Habeas Corpus by a Person in State Custody pursuant to 28 U.S.C. § 2254 ("Petition") be denied and the action dismissed with prejudice.

## I.

### PROCEDURAL HISTORY

Petitioner Darlene Brazil is a California state prisoner serving two concurrent terms of 15–years–to–life for her 1987 conviction by plea agreement for the second degree murders of her four-year-old and one-year-old sons. (*See* Petition at 2; Lodgments 1–3.) Petitioner, represented by counsel in the current action, challenges a November 29, 2005 decision by a panel of the California Board of Prison Hearings ("Board") which found Petitioner unsuitable for parole under California Penal Code § 3041(b), resulting in a one-year parole denial.[1] (*See* Petition at 1, 5–6; *see also* Petition Memorandum of Points and Authorities ("Petition Mem.") at 1–37; Lodgment 3.) This appears to have been the fifth such denial by the Board; Petitioner's minimum eligible parole date was January 14, 1996.[2] (*See* Petition Mem. at 5–6;

---

1. The Court notes that, effective July 1, 2005, the Board of Prison Hearings replaced the Board of Prison Terms. Cal.Penal Code § 5075(a). Depending on the context, the Court's reference to the "Board" herein refers either to the relevant parole agency or to the panel of commissioners which conducted the challenged parole suitability hearing in this case.

2. *See, e.g., In re Dannenberg,* 34 Cal.4th 1061, 1078, 23 Cal.Rptr.3d 417, 104 P.3d 783 (2005) ("indeterminate sentencees" such as Petitioner "may serve up to life in prison," but they "become eligible for parole consideration after serving minimum terms of confinement") (citations omitted); *In re Rosenkrantz,* 80 Cal.App.4th 409, 414 n. 1, 95 Cal.Rptr.2d 279 (2000), *overruled* in *part* by *In re Rosenkrantz,* 29 Cal.4th 616, 128 Cal.Rptr.2d 104,

Lodgment 3 at 26–27.)

Petitioner sought collateral review of the Board's decision before the state superior, appellate, and supreme courts, in that order. (Lodgments 4–6.) Each state court denied relief, with the last such denial issued by the California Supreme Court on August 16, 2006. (*Id.*) Petitioner filed the present Petition on September 11, 2006. (Petition at 1.) On December 7, 2006, Respondent filed her Answer to the Petition. (Answer at 1–10; *see also* Memorandum of Points and Authorities in Support of Answer ("Answer Mem.") at 1–12.) Petitioner filed her Traverse to the Answer on December 21, 2006, as well as additional briefing on March 21, 2007. (*See* Traverse at 1–23; Notice of Newly Published Ninth Circuit Authority at 1–5.)

The matter stands submitted and ready for decision. For the reasons that follow, the Magistrate Judge recommends that the Court deny the Petition and dismiss this action with prejudice.

## II.

## FACTUAL HISTORY

The following factual background underlying Petitioner's murder convictions is taken from Petitioner's probation report, which was adopted and incorporated by reference, in part and without objection by Petitioner or her hearing counsel, by the Board for its statement of the offenses. (Lodgment 2 at 8–11; *see* Lodgment 3 at 40) (citing *id.* at 8–9 (original page numbers 4–5).)

El Dorado County Sheriff's reports indicate officers Chaucer and Mays were dispatched to 1111 Excelsior Road, Placerville, at 2:45 a.m. on May 20, 1986, regarding a homicide. Upon arrival they were met in the driveway by Phillip

Dore who reported the crime. He directed the officers inside the residence where they observed two adult women on a "hide-a-bed" in the living room. At that time Deputy Chaucer directed the emergency medical technicians to the room.

Deputy Chaucer asked the two women (Myrtle Norcom and [Petitioner]) to move out of the way for the E.M.T.'s and he saw two young boys on the bed. They were motionless. He moved [Petitioner] to the kitchen. He observed blood on her clothing and her right wrist appeared to be cut. Deputy Chaucer asked her what happened and she stated, "My husband was going to take my kids and I suffocated them and was going to kill myself to be with them."

[Petitioner] was placed under arrest for the crime of murder and transported to Marshall Hospital for medical treatment. William Joseph Dingess, age four, was dead at the scene. Brian Douglas Adolph, Jr., age one, was transported to Marshall Hospital where he was pronounced dead. Later autopsies revealed both children died of "probable asphyxia" (suffocation).

Detectives Schmalz and Wilson arrived at the scene at 3:30 a.m. They observed the livid body of Billy Dingess on the bed, and saw spots of blood and mucus on the sheet near the body. A white pillow was also observed on the bed. A blood stained, wood-handled kitchen knife was located on a couch near the hide-a-bed.

Myrtle Norcom and Philip Dore, the owners of the residence, stated they were awakened by screams coming from the living room. When they entered the room they saw [Petitioner] lying on the

59 P.3d 174 (2002) (noting that California parole regulations define the "minimum eligible parole date for life prisoners as the earliest date on which the prisoner may legally be released on parole") (citing 15 Cal.Code Regs. § 2000(b)(65)).

bed next to the children with a leather belt secured around her neck. Dore removed the belt and observed the bleeding cut on the inside of her right wrist. Norcom indicated she asked [Petitioner] why and she stated "Fred (Dingess) said he didn't want to see me anymore and I don't want to live without him." Norcom then observed the children and knew something was wrong; Dore was telephoning 911 at that time. Norcom picked up one-year-old Brian and could see he was not breathing; [Petitioner] stated, "I'm sorry, I'm sorry". She then rolled over and hugged four-year-old Billy stating, "I love you, I'm sorry". Witness Norcom indicated she has been friends with [Petitioner] for some time and her relationship was somewhat like mother-daughter with [Petitioner] and as grandmother-sons with the victims.

At 5:20 a.m. [Petitioner] was interviewed by Detectives Schmalz, Wilson and Hennick after she had been booked into custody at the jail. [Petitioner] stated that on the previous night, May 19, 1986, she was in her ex-husband's (Fred Dingess) car with a friend and her children when she observed him in front of Raymond's Liquor Store. They argued for a period of time after which she took her friend home. As she was driving to the residence on Excelsior Road the vehicle broke down in front of the 49er Liquor Store on Main Street, Placerville. Dingess pulled up near her with her vehicle and subsequently exchanged cars. As she left with her children to return home she stated to Dingess, "No matter what happens, we all still love you".

She stated she returned to the residence on Excelsior Road at approximately 11:00 p.m. After everyone else went to bed she obtained a knife from the kitchen sink. She stated she was sitting on the bed, the knife near her, when her son, Billy, began to awaken. She said she told him she loved him and that they would always be together. She indicated he stated that he loved her [too]. She stated she took one of the white pillows from the bed, placed it over Billy's face and held it there until he stopped struggling. At this point the other child, Brian, began to wake up and she gave him a baby bottle to quiet him. After Billy stopped struggling, she took a pillow and did the same to Brian. She indicated she then took the leather belt, placed it around her neck and tightened it. She related she took the knife and cut her right wrist three times. She believes she lost consciousness and then awoke screaming. [Petitioner] stated to the detectives that the reason she killed her children was because she saw no use in life and wanted the children to be with her. [Petitioner] has been in custody since May 20, 1986.

A later interview by the detective with Frederick Dingess, [Petitioner's] ex-husband, confirmed the argument near Raymond's Liquor Store and the exchange of vehicles near the 49er Liquor Store. An interview with Myrtle Norcom confirmed the troubled relationship between [Petitioner] and her ex-husband and the circumstances of the crime scene upon her arrival that night.

(Lodgment 2 at 8–11.)

The probation report noted also that, in her statement to the probation officer who prepared the report, Petitioner's description of "the events of the night and early morning hours of this offense was quite similar to her statement to detectives on the day of her arrest." (*Id.* at 11–12; *see also id.* at 12–13 (summarizing Petitioner's statement).)

At her parole hearing, Petitioner also described the course of events which culminated in the murders. (Lodgment 3 at 40–50.) Petitioner's account was largely

similar to the factual summary set forth above but offered additional detail regarding the content of her argument with her former husband in the hours before the murders and why that argument, as she has claimed, led her to decide to kill both of her sons. (*Id.*)

According to Petitioner, when she encountered her former husband, "he had a girl with him." (Lodgment 3 at 40–41.) He then "said some words to me about the girl that he had, and that he's been with her and that she was better in bed and all that stuff. I got very distraught." (*Id.* at 41.) Petitioner recalled "crying very, very, very much" at a later car exchange with her ex-husband and that, before she drove back to the nearby residence where she and her children were staying, told her ex-husband, " 'No matter what, always know that we all love you very much.' " (*Id.*) Petitioner then offered her account of the subsequent murders themselves, which was similar to the above-noted account she gave to police detectives and the probation officer. (*Id.* at 41–42; *see* Lodgment 2 at 8–13.)

After Petitioner concluded her account, the presiding Board commissioner noted to Petitioner that why someone would have an emotional response to the "loss of a loved one or a divorce and separation" would be "fairly obvious to most people." (Lodgment 3 at 42.) But, the commissioner continued,

> What people have a difficult decision understanding is why someone would kill children. That's the difficult part. And certainly, we have heard of people . . . who have committed suicide, and these things happen and they're unfortunate. . . . But again, the killing of children is not common. So . . . as a hearing board we have a difficult time understanding some of these things. . . . [A]nd to take a look at your opportunity for parole we have to understand as

much as we can of what you were thinking about that night, how it affected you, how it affects the crime, the gravity of the crime, and where you are today and what you've done over the last these many years since you've been here. So I have to ask you, why did you kill the children? . . . .

(*Id.* at 42–43.) Petitioner responded that,

> [U]nfortunately I took my emotions and my feelings and put them on the innocent victims. I didn't see that there could have been somebody else out there for them. . . . [¶] . . . . [¶] . . . . I figured that the best and safest place for all of us to go since that night, that was the last person in the whole world that I was told that ever cared about me and loved me, so since he said all that, that meant that there was nobody left in the world that loved me and cared about me. And I took those feelings and I put them on my boys also, and so that's why I figure the safest place for us to go would be to heaven where we would be okay. . . .

(*Id.* at 43–45.)

Petitioner stated that she had not ingested drugs or alcohol before the murders and that, while both children had struggled while she was suffocating them, it had not occurred to Petitioner to stop her actions. (Lodgment 3 at 48–49.) Petitioner noted also that she had "just turned 21 years old" at the time of the murders, "was unaware of the help out there" and "actually didn't even think I had any emotional problems," but that "[t]oday I reach out for help. Today I . . . have learned and I've grown, and I know that this will never happen again." (*Id.* at 49.)

After presentation of additional matters regarding Petitioner's parole suitability (discussed further below), the Board recessed proceedings, and then announced its decision to deny parole because of the Board's conclusion that Petitioner was "not suitable for parole and would pose an un-

reasonable risk of danger to society or threat to public safety if released from prison." (Lodgment 3 at 50–117.) The Board noted the following circumstances upon which it had relied in reaching that conclusion. (*Id.*)

The Board first stated:

[T]he Hearing Panel takes many factors into consideration when we take a look at parole. And one that is first and foremost is, of course, the commitment or the offense and the gravity of the offense. And the horrendous nature of this crime, of course, could not be escaped. The commitment offense did involve multiple victims. It was a suffocation death of William Dingess, age four, and Brian Adolf, age one, by the inmate. These were her children. They were especially vulnerable and the act was cruel and vicious. Further, it was a calculated act, it was a calculated act on her part. And she did in fact have time to think about it. It wasn't an immediate response to danger. In addition, she also thought about how she was going to take even her own life. Therefore, the planning of the entire sequence was in fact in place when it all happened. It was carried out in a dispassionate manner and by all accounts she very calmly went about the murder of two defenseless children. The death of these two young boys showed obvious lack of regard for life and suffering [of] others. The motive for the crime was truly inexplicable. The inmate states she wanted the three of them to go to heaven. Bitter and unresolved relationship issues between she and her former husband she felt was going to be resolved. And her way of resolving them of course was the murder of the two children . . . . .

(Lodgment 3 at 108–109.)

The Board then noted that Petitioner had "a fairly stable social history" and "had no signs of abuse or molestation in her background"; the Board noted also that Petitioner "had no use for illegal drugs or alcohol early in her life." (Lodgment 3 at 109–10.) The Board stated that Petitioner's "[i]nstitutional behavior has been very good," noting "one serious 115 disciplinary report for 2–3 of 1995 for homosexual activity"[3] and "two 128A Counseling Chronos, the last one being 10–12 of 1993 for not standing for count."[4] (*Id.* at 110.)

With respect to Petitioner's then-most recent 2005 psychological evaluation, the Board noted that while the report contained statements by the evaluating psychologist which appeared to indicate support for Petitioner's release, the psychologist had in fact stated that Petitioner's " 'risk of future dangerousness probably falls in the low to moderate range in relation to the risk of the population and released felons.' " (Lodgment 3 at 110; *see* Lodgment 8 at 195.) The Board noted that support for release generally would be stated when an inmate's risk of dangerousness was "in the low and not necessarily in the moderate range. But he still views you as low to moderate."[5] (Lodgment 3 at

---

3. Under state prison regulations, "[w]hen misconduct is believed to be a violation of law or is not minor in nature, it shall be reported on a CDC Form 115 (Rev. 7/88), Rules Violation Report." 15 Cal.Code Regs. § 3312(a)(3).

4. Under state prison regulations, "[w]hen . . . minor misconduct recurs after verbal counseling or if documentation of minor misconduct is needed, a description of the misconduct and counseling provided shall be documented on a CDC Form 128–A, Custodial Counseling Chrono." 15 Cal.Code Regs. § 3312(a)(2).

5. At the end of the hearing, the Board noted to Petitioner,

I'm going to mention to you because I have referenced the fact that the [psychologist who prepared Petitioner's current psy-

110–11; *see also id.* at 116.) In addition, the Board noted that the psychiatrist who had prepared the next most recent evaluation only some two years before (in 2003) was not supportive of Petitioner's release and had stated, " '[t]hough the inmate has made significant strides in improving herself, I do not believe she has achieved the results that would be necessary for her to maintain some level of stability should she be released to the community.' " (Lodgment 3 at 111; *see also* Lodgment 7 at 188.)

The Board noted that, with respect to parole plans, Petitioner did have "viable residence plans," but that her employment plans "need[ed] to be firmed up, they need to be more detailed, and they need to be more specific," although Petitioner did have marketable (computer) skills, which the Board also recommended that she keep current. (Lodgment 3 at 111–12.) The Board noted further that the prosecuting district attorney's office had recommended against Petitioner's release, and that letters supporting her release, as well as letters and petitions opposing her release, also had been presented to the Board. (*Id.* at 112.) The Board commended Petitioner for her participation in self-help programs while incarcerated, noting that certain "programming" was particularly relevant in light of the nature of her commitment offense and "dealing with codependency" issues, and also in terms of anger management and "resolv[ing] stressful situations," and recommended that she "keep up in the [self-help] areas that are available" in prison. (*Id.* at 112–14.)

After issuing a one-year denial, the Board recommended that Petitioner "stay disciplinary free", continue upgrading herself vocationally and educationally (including working toward a junior college degree), and continue participating in self-help programs. (Lodgment 3 at 114–16.)

On subsequent collateral review, the El Dorado County Superior Court rejected Petitioner's claims challenging the Board's parole denial and the propriety of her continued incarceration, stating that,

> The Court has reviewed the petition for writ of habeas corpus and exhibits attached thereto. From this review, it is apparent that the Board . . . considered all relevant factors in deciding to deny petitioner's parole release. The Board denied parole based on the seriousness of the crimes and two psychiatric reports in 2005 and 2003 which indicated either that petitioner was a "low to moderate" risk of future dangerousness or not stable enough to be released. This was essentially a decision that petitioner would still pose a public safety risk if released from prison. This conclusion was supported by "some evidence" and thus was not arbitrary or capricious or violative of due process of law (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 658, 128 Cal.Rptr.2d 104, 59 P.3d 174).
>
> A prima facie case for relief has not been stated by the petition. Accordingly, the petition for writ of habeas corpus relief is denied.

(Lodgment 4 at 119.) The California Court of Appeal and California Supreme

---

chological evaluation], although he gave you and appeared to support your release, he did in fact give you a low to moderate level of risk, that's not unusual when he supports a person that it's a low level of risk. So what I'm doing is I'm asking that

the psychology department, psychiatric department here take a look at that reference again, and so they may want to retest you in regard to this before you have your next hearing.
(Lodgment 3 at 116.)

Court thereafter summarily denied relief of the same claims. (Lodgments 5–6.)

## III.

### PETITIONER'S CLAIMS

In Grounds One through Three, Petitioner contends that the Board's decision to deny parole violated her right to due process under the federal constitution because:

A. The basis for decision articulated by the Board was "arbitrary, unsupported by any evidence, inapposite to the record, inherent in all second-degree murders, and/or irrelevant to parole determination under the [state parole] regulations" (Ground One);

B. The Board failed to establish a nexus between the cited offense factors and Petitioner's "current parole risk, because the [cited] factors apply only to special circumstance first-degree murders, and because the [Board] lacked the requisite preponderance of evidence indicating that [Petitioner's] parole would pose an unreasonable risk of danger to public safety; no rational [Board] panelist who reviewed the evidence of [Petitioner's] parole suitability could have found a preponderance of unreasonable risk" (Ground Two); and

C. An interminable denial of parole "based solely on her commitment of the second degree murders" impermissibly "has converted [Petitioner's] term [of 15–years–to–life into a term of] life without any possibility of parole" because neither Petitioner's offense facts nor parole suitability otherwise can improve, Petitioner purportedly has served the maximum prison term prescribed for the particular facts of her offenses, and Petitioner is otherwise suitable for release on parole (Ground Three).

(Petition Mem. at 8–32 (capitalization omitted).)

Grounds Four and Five set forth a number of generalized federal due process arguments which allege that California's governor(s) and/or the Board have and maintain a systemic policy and bias against granting parole such that Petitioner's parole denial resulted from such policy and bias and not from her actual suitability for parole and, thus, her continued incarceration is improper. (Petition Mem. at 32–35.) In this respect, Petitioner contends that:

A. California's "executive branch" has an "anti-parole policy" which impermissibly led to the denial of parole in her case; in addition, in violation of mandatory state law calling for the selection and appointment of commissioners to " 'reflect as nearly as possible a cross-section of the racial, sexual, economic, and geographic features of the population of the state,' " California's "executive branch" has, instead, constituted the Board with commissioners who are "strictly political appointees to promote the governors' publicly-proclaimed anti-parole mandate" and who themselves also are biased against parole and otherwise do not fulfill the relevant statutory cross-section mandate, and, as a result, "it is virtually impossible to constitute [an individual] parole panel not inherently biased against Petitioner and her parole" (Ground Four); and

B. California's "[g]overnor" and the Board "have established and implemented a firm policy that precludes the parole of any indeterminately sentenced inmate in Petitioner's position whose commitment offense in-

volved the murder of an infant or child" (Ground Five).

(*Id.* (capitalization and citations omitted).)

Finally, in legal argument designated as a claim for relief (Ground Six) and pertaining to which standard of review should be applied to Petitioner's present federal due process claims, Petitioner contends that the "some evidence" standard which the Ninth Circuit (and California) has repeatedly concluded applies to judicial review of federal due process claims regarding parole denials by a state parole board or governor (discussed further below) is inapplicable herein. (Petition Mem. at 35–36.) While Petitioner's argument does not set forth a freestanding claim for federal habeas relief, the Court addresses Petitioner's argument below.

## IV.

### STANDARD OF REVIEW

The Court has reviewed the present Petition under the Anti–Terrorism and Effective Death Penalty Act ("AEDPA"), which applies in parole denial cases. *See Sass v. California Board of Prison Terms,* 461 F.3d 1123, 1126–27 (9th Cir.2006). In relevant part, the AEDPA provides:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254.

The Supreme Court has explained the standard of review under the AEDPA as follows:

Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts. "Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner" case.

*Williams v. Taylor,* 529 U.S. 362, 412–13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A state court's decision is an "unreasonable application" of Supreme Court precedent if it is "objectively unreasonable" which "requires the state court decision to be more than incorrect or erroneous." *Lockyer v. Andrade,* 538 U.S. 63, 75, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003); *Ortiz–Sandoval v. Clarke,* 323 F.3d 1165, 1169–70 (9th Cir. 2003). Thus, "an unreasonable application is different from an incorrect one." *Bell v. Cone,* 535 U.S. 685, 694, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002); *accord Price v. Vincent,* 538 U.S. 634, 643, 123 S.Ct. 1848, 155 L.Ed.2d 877 (2003) (even where reviewing court might find that error occurred, habeas relief is not warranted where state court denial of claim is "at least reasonable").

Under the AEDPA, circuit law may be "persuasive authority for purposes of determining whether a particular state court decision is an 'unreasonable application' of Supreme Court law." *Davis v.*

*Woodford,* 384 F.3d 628, 638 (9th Cir.2004) (quotation omitted). However, only the Supreme Court's holdings need be reasonably applied by the state courts under the AEDPA. *Andrade,* 538 U.S. at 71–72, 123 S.Ct. 1166.

With respect to the present Petition, Grounds One through Three advance the same principal argument: the Board's decision to deny parole violated Petitioner's right to federal due process because the decision was contrary to and not supported by evidence in the record, given that such evidence instead showed Petitioner's suitability for parole release under relevant state law. (Petition Mem. at 8–32.) Grounds Four and Five (as well as certain portions of Grounds One through Three) present more generalized federal due process allegations regarding the propriety of Petitioner's continued incarceration which are not directly linked to the specific parole proceedings in this case and a determination of whether Petitioner is suitable for parole release. (*Id.* at 8–35.)

The record reflects that Petitioner raised the allegations of Grounds One through Five on collateral review before the El Dorado County Superior Court, the California Court of Appeal, and the California Supreme Court, in that sequence. (Lodgments 4–6.) The state superior court denied relief by reasoned order which expressly addressed the Board's decision to deny parole. (Lodgment 4 at 119 (citations omitted).) But, while the state superior court's order denied the petition in its entirety, it did not expressly address Petitioner's more generalized federal due process allegations set forth in Grounds One through Five. (*Id.*) Thus, the state superior court's order indicates a summary denial of Petitioner's more generalized due process allegations. (*Id.*) Without citation to authority, the state appellate and supreme courts thereafter summarily denied relief of all of Petitioner's claims. (Lodgment 5 at 151; Lodgment 6 at 152, 159–60.) Thus, all three state courts issued summary denials of Petitioner's more generalized federal due process arguments. (Lodgments 4–6.)

With respect to this Court's review of those portions of Grounds One through Three which are directed toward the Board's decision to deny parole, the state superior court's order is the last reasoned state-court decision thereto. (Lodgments 4–6.) Therefore, that order is the focus of the Court's review under the AEDPA with respect to these portions of Grounds One through Three.[6] *See Ylst v. Nunnemaker,* 501 U.S. 797, 803, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991) ("[w]here there has been one reasoned state court judgment rejecting a federal claim, [federal habeas

**6.** By passing and unclear argument, Petitioner appears to suggest that the *reasoned* portion of the state superior court's order must be considered objectively unreasonable under the AEDPA for the state superior court's "failure" to rule on all of Petitioner's allegations. (Traverse at 3–5.) Petitioner contends that the state superior court "failed" to rule where it did not state a reason for denying an allegation presented to it by Petitioner. (*Id.*) Petitioner's conclusory and largely passing arguments in these respects are neither clearly stated nor persuasive in terms of establishing any "failure" to rule in the first instance (*see, e.g., Hunter,* 982 F.2d at 347–48) or explaining how a "failure" to rule in one area must

render an express ruling in another area objectively unreasonable. In any event, even assuming *arguendo* that the *reasoned* portion of the state superior court's decision was objectively unreasonable within the meaning of the AEDPA for "failing" to rule on other allegations (or otherwise) and therefore not entitled to *any* deference, on the Court's resulting de novo review (*see, e.g., Inthavong v. Lamarque,* 420 F.3d 1055, 1058–59 (9th Cir. 2005); *Caliendo v. Warden of California Men's Colony,* 365 F.3d 691, 695 (9th Cir.2004)), the result would be the same: as set forth below, the subject allegations simply do not present a basis for federal habeas relief. (*See also* footnote 7, *infra.*)

courts should presume that] later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground").

 With respect to the more generalized federal due process allegations set forth in Grounds One through Five, the record reflects summary denials of such allegations. (Lodgments 4–6.) While a summary denial is considered to be on the merits, *see, e.g., Hunter v. Aispuro,* 982 F.2d 344, 347–48 (9th Cir.1992), it does not comprise a "reasoned" state court decision. *See Pham v. Terhune,* 400 F.3d 740, 742 (9th Cir.2005); *Himes v. Thompson,* 336 F.3d 848, 853 (9th Cir.2003); *Greene v. Lambert,* 288 F.3d 1081, 1088–89 (9th Cir. 2002). Therefore, the Court must conduct an "independent review of the record" with respect to these allegations. *Delgado v. Lewis,* 223 F.3d 976, 981–82 (9th Cir.2000); *Allen v. Ornoski,* 435 F.3d 946, 955 (9th Cir.2006) (" 'independent review' " is not the equivalent of *de novo* review, but rather is a style of review which views the state court decision "through the 'objec-

tively reasonable' lens ground by [the Supreme Court in] *Williams [v. Taylor]* ").[7]

## V.

## THE BOARD'S DECISION TO DENY PAROLE

 Petitioner's first through third claims advance the same principal argument: the Board's decision to deny parole violated Petitioner's right to federal due process because the decision was contrary to and not supported by the evidence in the record, given that the evidence showed instead Petitioner's suitability for parole release under relevant state law.[8] (Petition Mem. at 8–32.) Petitioner's contentions have no merit.

California Penal Code section 3041 vests ... all ... California prisoners whose sentences provide for the possibility of parole with a constitutionally protected liberty interest in the receipt of a parole release date, a liberty interest that is protected by the procedural safeguards of the Due Process Clause. *Sass [v. California Board of Prison Terms,* 461 F.3d 1123, 1128 (9th Cir.2006)];

7. As noted, Petitioner contends that the state superior court "failed" to rule where it did not state a reasoned basis for denying each of Petitioner's allegations. (Traverse at 3–5.) As also noted, while the state superior court's order denied the subject petition in its entirety, it did not expressly address Petitioner's more generalized federal due process allegations that are set forth in Grounds One through Five. (Lodgment 4 at 119.) To the extent that Petitioner argues that the state superior court's order must be considered objectively unreasonable for "failing" to rule on these allegations, such an argument (whatever its merit, *see, e.g., Hunter,* 982 F.2d at 347–48) does not address the *limits* of "look-through" review in a federal habeas case. That is, after the state superior court issued the subject order, the state appellate and supreme courts issued summary denials of all of Petitioner's allegations. (Lodgments 4–6.) A federal habeas court *only* "looks through" later summary denials to a prior *reasoned*

decision by a state court. *Ylst,* 501 U.S. at 803, 111 S.Ct. 2590. Thus, even assuming *arguendo* that the state superior court "failed" to rule on the noted allegations, it issued no *reasoned* decision on them. (Lodgment 4 at 119.) The Court would not "look through" the later summary denials on the merits to an "unreasoned" decision by the state superior court and "independent review" still would apply, as stated herein. *See Ylst,* 501 U.S. at 803, 111 S.Ct. 2590; *Delgado,* 223 F.3d at 981–82; *Hunter,* 982 F.2d at 347–48.

8. In this section of the current Report and Recommendation, the Court also addresses Petitioner's more generalized federal due process allegations that are set forth in Grounds One through Three, as well as Petitioner's legal arguments in "Ground Six" that the "some evidence" standard of review does not apply in her case. (Petition Mem. at 8–32, 35–36.)

*Biggs [v. Terhune,* 334 F.3d 910, 914 (9th Cir.2003) ]; *McQuillion v. Duncan,* 306 F.3d 895, 903 (9th Cir.2002); *see also Bd. of Pardons v. Allen,* 482 U.S. 369, 377–78, 107 S.Ct. 2415, 96 L.Ed.2d 303 (1987) (quoting *Greenholtz v. Inmates of Neb. Penal & Corr. Complex,* 442 U.S. 1, 12, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979)).

*Irons v. Carey,* 505 F.3d 846, 850–51 (9th Cir.2007) (as amended).[9]

 A parole board's decision to deny parole does not satisfy the requirements of due process unless "some evidence" supports the decision. *Sass,* 461 F.3d at 1128–29 (adopting the "some evidence" standard for disciplinary hearings outlined in *Superintendent, Massachusetts Correctional Inst. v. Hill,* 472 U.S. 445, 455–57, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985)). The "some evidence standard is minimal, and assures that 'the record is not so devoid of evidence that the findings of the ... board were without support or otherwise arbitrary.' " *Id.* at 1129 (quoting *Hill,* 472 U.S. at 457, 105 S.Ct. 2768). Under application of the "some evidence" standard, " 'the relevant question is whether there is any evidence in the record that could support the conclusion reached' " by a state parole board. *Id.* at 1128 (quoting *Hill,* 472 U.S. at 455–56, 105 S.Ct. 2768). Thus, evidence that is "meager" or indirect may comprise "some evidence" to support an administrative decision. *Hill,* 472 U.S. at 457, 105 S.Ct. 2768; *McQuillion,* 306 F.3d at 904 ("[t]he fundamental fairness required by the Due Process Clause does not require courts to set aside decisions of prison administrators that have *some* basis in fact") (citations omitted, emphasis in original); *Sass,* 461 F.3d at 1128–29; *Irons,* 505 F.3d at 851.[10]

9. Although the Ninth Circuit by now has held repeatedly that there is a "clearly established" liberty interest in parole, by unclear and inconsistent arguments herein, Respondent *appears* to seek to have this Court disregard the Ninth Circuit's holdings. (*See* Answer at 6 and n. 2; Answer Mem. at 3–5 and n. 1.) However, this Court is bound by its Circuit's precedent in the absence of an intervening and contrary Supreme Court decision, and Respondent has pointed to no such decision. *See, e.g., Hart v. Massanari,* 266 F.3d 1155, 1170 (9th Cir.2001) (district judge may not "disagree with his learned colleagues on his own court of appeals who have ruled on a controlling legal issue"); *Zuniga v. United Can Co.,* 812 F.2d 443, 450 (9th Cir.1987) ("[d]istrict courts are, of course, bound by the law of their own circuit").

10. By way of allegations designated as "Ground Six," Petitioner unclearly argues that the "some evidence" standard should not apply to her case; Petitioner ultimately suggests that the Court should instead follow the lead of the Minnesota Supreme Court and apply a "substantial evidence" standard to her claims. (*See* Petition Mem. at 35–36 (citations omitted); Traverse at 22.) Petitioner's arguments do not address and would have this Court disregard the herein-noted Ninth Circuit decisions which by now have repeatedly held that the "some evidence" standard is clearly established for AEDPA purposes to determine whether a state's parole denial resulted in a federal due process violation. Since Petitioner is unable to point to any *intervening* and contrary Supreme Court decision contravening the noted Ninth Circuit precedent (and because Petitioner's arguments are both unclearly stated and otherwise unpersuasive), as set forth above, this Court is bound by the Ninth Circuit authority, and will review the relevant parole decision pursuant to the "some evidence" standard articulated by the Ninth Circuit.

In Ground Two, Petitioner asserts also that individual Board "panels" have *themselves* impermissibly "adopted the 'some evidence' standard reserved for a *reviewing court's* assessment of executive decisions" instead of the state's good cause/preponderance of the evidence standard upon which their determinations must be based. (Petition Mem. at 14–18 (citations omitted, emphasis in original).) Petitioner asserts further that in the present case, "no rational panelist could have found based on a weighing of all evidence in the record addressing Petitioner's current suitability for parole that a preponderance of that evidence indicated that her parole currently

■■■■■ In addition, "[w]hen [a reviewing court assesses] whether a state parole board's suitability determination was supported by 'some evidence' in a habeas case, [the court's] analysis is framed by the statutes and regulations governing parole suitability determinations in the relevant state." [11] *Irons*, 505 F.3d at 851 (citing *Biggs*, 334 F.3d at 915). In California, state authorities are allowed "to consider a myriad of factors when weighing the decision of granting or denying parole." *Biggs*, 334 F.3d at 915; *see, e.g., In re Powell*, 45 Cal.3d 894, 902, 248 Cal.Rptr. 431, 755 P.2d 881 (1988) (California authorities' discretion in parole matters is "great" and "involves the deliberate assessment of a wide variety of individualized factors on a case-by-case basis, and the striking of a balance between the interests of the inmate and the public") (internal quotations and citation omitted).

Here, the Board's parole denial rested on application of California Penal Code § 3041(b).[12] (Lodgment 3 at 26–27, 108–17) Section 3041(b) provides that the Board panel "shall set a release date un-

less it determines that the gravity of the current or convicted offense or offenses, or the timing and gravity of [the] current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting." In addition,

The regulations governing murderers serving indeterminate life sentences have long provided that determination of an inmate's *suitability* for parole under section 3041, subdivision (b) must precede any effort to set a parole release date under the uniform-term principles of section 3041, subdivision (a).[13] As currently worded, the regulations specify that "[t]he panel shall *first* determine whether the life prisoner is *suitable* for release on parole. *Regardless of the length of time served,* a life prisoner shall be found unsuitable for and denied parole if in the *judgment of the panel* the prisoner will pose an unreasonable risk of danger to society if released from

poses an unreasonable risk of danger to public safety[.]" (*Id.* at 17–18.) Petitioner's arguments are unclear and conclusory in these respects. To the extent that Petitioner raises a claim of state law error because the Board panel in her case purportedly did not properly apply state parole regulations, federal habeas relief is not available for a claim of state law error. *See, e.g.,* 28 U.S.C. § 2254(a); *Estelle v. McGuire*, 502 U.S. 62, 70, 72, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). To the extent that such arguments largely restate Petitioner's assertion that the Board's parole denial violated due process because it was contrary to and not supported by evidence in the relevant record, that assertion is reviewed herein in accordance with the "some evidence" standard. *See, e.g., Irons,* 505 F.3d at 851.

11. Thus, the reviewing court must look to California law to determine the findings that are necessary to deem a prisoner unsuitable for parole, and then must review the record in order to determine whether the state court

decision holding that these findings were supported by "some evidence" in [the prisoner's] case constituted an unreasonable application of the "some evidence" principle articulated in *Hill,* 472 U.S. at 454, 105 S.Ct. 2768.

*Irons,* 505 F.3d at 851.

12. *See Dannenberg,* 34 Cal.4th at 1078, 23 Cal.Rptr.3d 417, 104 P.3d 783 (California Penal Code "[s]ection 3041 addresses how the Board is to make parole decisions for indeterminate life inmates," such as Petitioner).

13. [T]he Board has adopted regulations covering the various categories of indeterminate life inmates. One set of these regulations applies specifically to noncapital murderers [like Petitioner] who committed their crimes on or after November 8, 1978. Cal.Code Regs., tit. 15, § 2400 et seq.

*Dannenberg,* 34 Cal.4th at 1078–79, 23 Cal. Rptr.3d 417, 104 P.3d 783.

prison." (Cal.Code Regs., tit. 15, §§ 2402(a), italics added.) *Dannenberg,* 34 Cal.4th at 1080, 23 Cal. Rptr.3d 417, 104 P.3d 783.

Section 2402 of Title 15 of the California Code of Regulations sets forth factors for a Board panel to consider when making a determination of suitability for release on parole under section 3041(b) and, thus, guides the Board's assessment of whether an indeterminate life inmate incarcerated for murder, like Petitioner, would pose "an unreasonable risk of danger to society if released from prison." 15 Cal.Code Regs. § 2402(a). Circumstances tending to show unsuitability are derived from, among other things, the aggravated or "especially heinous, atrocious or cruel manner" in which the subject offense was committed (including that multiple victims were killed in the same incident, that the offense was carried out in a manner which was dispassionate and calculated and/or demonstrated an exceptionally callous disregard for human suffering, and that the motive for the crime was inexplicable or very trivial in relationship to the offense),[14] as well as the inmate's previous record of violence, unstable social history, lengthy history of severe mental problems related to the offense, and/or engagement in serious misconduct in prison or jail. 15 Cal.Code Regs. § 2402(c). Circumstances tending to show suitability include the inmate's positive rehabilitative efforts while in prison and demonstration of remorse, as well as evidence indicating that the inmate committed the crime as the result of significant stress in his or her life, particularly where the stress had built over a longer period of time. 15 Cal.Code Regs. § 2402(d).

The foregoing and other listed circumstances "are set forth as general guidelines" for a particular Board panel, with "the importance attached to any circumstance or combination of circumstances in a particular case ... left to the judgment of the panel." 15 Cal.Code Regs. § 2402(c)-(d). In addition, a Board panel is not limited to consideration of only those factors which are listed in Board regulations, but is allowed to consider "[a]ll relevant, reliable information available" in reaching its decision. 15 Cal.Code Regs. § 2281(c)-(d).

 In *In re Lawrence,* 44 Cal.4th 1181, 1212–29, 82 Cal.Rptr.3d 169, 190 P.3d 535 (2008), the California Supreme Court recently addressed the "relevant inquiry" for the Board and/or Governor to make in determining parole suitability in a given case, particularly with respect to the role the commitment offense itself may play in such an inquiry. As the state supreme court explained,

> the circumstances of the commitment offense (or any of the other factors related to unsuitability) establish unsuitability if, and only if, those circumstances are probative to the determination that a prisoner remains a danger to the public. It is not the existence or nonexistence of suitability or unsuitability factors that forms the crux of the parole decision; the significant circumstance is how those factors interrelate to support a conclusion of current dangerousness to the public.

*Id.* at 1212, 82 Cal.Rptr.3d 169, 190 P.3d 535. Moreover,

> the aggravated nature of the crime does not in and of itself provide some evi-

---

**14.** Factors beyond the "minimum elements" of the crime (i.e., its status as an aggravated crime under the parole regulations) are reflected by those unsuitability factors regarding the aggravated or "especially heinous,

atrocious or cruel manner" of the commission of the offense itself, as set forth in section 2402(c)(1) of the regulations. *Irons,* 505 F.3d at 851–52 (citations omitted).

dence of *current* dangerousness to the public unless the record also establishes that something in the prisoner's pre- or post-incarceration history, or his or her current demeanor or mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his commission of the commitment offense remain probative to the statutory determination of a continuing threat to public safety.

*Id.* at 1214, 82 Cal.Rptr.3d 169, 190 P.3d 535 (emphasis in original); *see also In re Shaputis,* 44 Cal.4th 1241, 1259–60, 82 Cal. Rptr.3d 213, 190 P.3d 573 (2008). A parole authority's determination of whether an inmate poses a current danger is not dependent upon whether the inmate's commitment offense is more or less egregious than other similar crimes. *Lawrence,* 44 Cal.4th at 1221, 82 Cal.Rptr.3d 169, 190 P.3d 535 (citing *Dannenberg,* 34 Cal.4th at 1083–84, 1095, 23 Cal.Rptr.3d 417, 104 P.3d 783). "Nor is it dependent solely upon whether the circumstances of the offense exhibit viciousness above the minimum elements required for conviction of that offense," as reflected in the above-noted parole regulations. *Id.* Instead,

> the relevant inquiry is whether the circumstances of the commitment offense, when considered in light of other facts in the record, are such that they continue to be predictive of current dangerousness many years after commission of the offense. This inquiry is, by necessity and by statutory mandate, an individualized one, and cannot be undertaken simply by examining the circumstances of the crime in isolation, without consideration of the passage of time or the attendant changes in the inmate's psychological or mental attitude.

*Lawrence,* 44 Cal.4th at 1221, 82 Cal. Rptr.3d 169, 190 P.3d 535 (citing *Rosenkrantz,* 29 Cal.4th at 682, 128 Cal.Rptr.2d 104, 59 P.3d 174). As a result, in some cases, an aggravated commitment offense may very well be predictive of "current dangerousness even decades after commission of the offense," such as where "the inmate has failed to make efforts toward rehabilitation, has continued to engage in criminal conduct post-incarceration, or has shown a lack of insight or remorse[.]" *Id.* at 1228, 82 Cal.Rptr.3d 169, 190 P.3d 535. *See also* 15 Cal.Code Regs. § 2402(a) ("Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison"); *Dannenberg,* 34 Cal.4th at 1078, 23 Cal.Rptr.3d 417, 104 P.3d 783 (quoting *id.*).

Here, the state superior court found that the Board's decision to deny parole was not a decision which was arbitrary or capricious or rendered in violation of due process because the Board had "considered all relevant factors," its decision to deny parole reflected the Board's determination that Petitioner "would still pose a public safety risk if released from prison," and the denial itself was supported by "some evidence." (Lodgment 4 at 119 (citations omitted).) As "some evidence" of parole unsuitability before the Board, the state superior court pointed to the aggravated nature of the commitment offense and two psychological evaluations indicating Petitioner's risk of danger to society or threat to public safety if released on parole. (*Id.*)

In sum, this Court agrees with the reasoning and conclusion of the state superior court that the Board's decision to deny parole does not reflect a due process violation—the gravity and nature of the commitment offense, along with the psychological evaluations, comprised "some evidence" before the Board which was probative of Petitioner's then *current* danger to the public if she were to be

released on parole at that time. Thus, the state superior court's decision was a reasonable one in this regard and entitled to AEDPA deference.

With respect to the commitment offense, the record before the Board reflected Petitioner's commission of two aggravated murders within the meaning of relevant California parole law, given not only the fact of the murders themselves and Petitioner's motive for committing them against her own and very young children, but the cruel and dispassionate way in which they were accomplished. Specifically, the aggravated nature of the crimes is reflected by the fact that there were *multiple* murder victims in this case, Petitioner's four-year-old and one-year-old sons.[15]

15 Cal.Code Regs. § 2402(c)(1)(A). Petitioner's actions against both young children reflected a callous disregard for their suffering in several ways, further reflecting an aggravated crime. 15 Cal.Code Regs. § 2402(c)(1)(D). First, Petitioner was aware of each child struggling as she suffocated them, but did nothing to abate their suffering and, instead, chose to continue on her course to kill them. (*See* Lodgment 3 at 48.) Second, Petitioner's actions were taken against two particularly vulnerable victims, in light of, among other things, their very young ages and their corresponding inability to physically defend themselves from their mother's separate and determined attack against each of them. *See, e.g., Small v. Sisto,* 2008 WL

---

**15.** Consistent with the relevant parole regulations and the record in this case, the Board looked to the facts of the incident and made the unassailable determination that the circumstances reflected the aggravating factor of multiple victims-Petitioner killed both of her children in a single incident. (Lodgment 1 at 3–4, Lodgment 2 at 8–16, Lodgment 3 at 108–09; *see* 15 Cal.Code Regs. § 2402(c)(1)(A)). But, Petitioner appears to attempt to refute or somehow minimize the applicability of this factor by noting that she received *concurrent* terms of *sentence* because of the sentencing judge's view that the murders were not "predominantly independent of each other," and because of the alleged operation of parole regulations after an inmate who has committed multiple murders may have been *determined* to be suitable for parole. (*See* Petition Mem. at 9 (citations omitted).) But, for purposes of parole consideration and pursuant to the relevant parole regulation, the multiple victim factor reflects an underlying circumstance in aggravation which is relevant to the determination of whether an inmate presents a current risk of *dangerousness* if released, and is derived from the facts of the manner of the commission of the offense itself, including when multiple victims were killed in the very same incident. *See* 15 Cal.Code Regs. § 2402(c)(1)(A) ("[m]ultiple victims were attacked, injured or killed in the *same* or separate incidents") (emphasis added). Thus, pointing to sentencing considerations and/or the alleged operation of the parole statutes

once a multiple murderer is, in fact, found to be eligible for parole does not refute or minimize the multiple victim circumstance for purposes of *determining* an inmate's suitability for parole in a given case.

Petitioner also raises unclear argument which notes that the "multiple victims" factor was derived from the first degree special circumstance murder statute and, thus, has acted to impermissibly "recast" her term as one of life without the possibility of parole ("LWOP"). (Petition Mem. at 12, 14.) On its face, Petitioner's argument here goes more toward *supporting* characterization of multiple-murder second degree murder convictions as *aggravated* offenses within the meaning of California parole law; arguably, the circumstances of the underlying crimes are heinous enough to call for a first degree LWOP (or death-eligible) murder charge in the appropriate case. And, even in light of the multiple victims factor, Petitioner's term simply has not been "recast" as an LWOP sentence-Petitioner's sentence is the same and, by contrast to a first degree murder/LWOP inmate, Petitioner remains eligible for parole despite murdering multiple victims in a single incident. And, as noted, that multiple victims were killed is a fact of the offense itself and its manner of commission and the resulting aggravated nature of the offense, and has bearing on the Board's determination of an inmate's current risk of dangerousness.

2561915, * 11–* 13, *15 (E.D.Cal., Jun. 25, 2008) (slip op.) (finding second degree murder of sixteen-month-old victim to be an aggravated offense within meaning of California parole law because of petitioner's "brutal conduct in killing a helpless child," which comprised "some evidence" to indicate that petitioner posed a current and unreasonable risk to public safety to support parole denial); *Thompson v. Mendoza–Powers*, 2008 WL 1776521, *4–*7 (E.D.Cal., Apr. 18, 2008) (slip op.) (finding second degree murder of two-month old child to be an aggravated offense within meaning of California parole law because, inter alia, victim was "defenseless and vulnerable" and had died as a result of cerebral edema occurring after skull fracture inflicted by the petitioner, which comprised "some evidence" to indicate that petitioner posed a current and unreason-

able risk to public safety to support parole denial).

The record reflects that within the meaning of California parole law, Petitioner's actions in committing the offenses reflected calculation and deliberation such that the second degree murders were aggravated ones. *See* 15 Cal.Code Regs. § 2402(c)(1)(C); *see also, e.g., Shaputis*, 44 Cal.4th at 1258–61, 82 Cal.Rptr.3d 213, 190 P.3d 573 (second degree murder was especially aggravated within meaning of California parole law because of evidence indicating intent and premeditation in its commission); *Rosenkrantz*, 29 Cal.4th at 678–79, 128 Cal.Rptr.2d 104, 59 P.3d 174 (aggravating circumstance for second degree murder within meaning of parole law was reflected by evidence indicating premeditation and deliberation in its commission).[16] The manner in which Petitioner

---

**16.** Because she was convicted of two counts of second, not first, degree murder, Petitioner appears to argue, ambiguously, that the Board was foreclosed from finding the murders to be aggravated as a result of being calculated, dispassionate, and reflecting a disregard for life to support parole denial. (Petition Mem. at 9–10 and n. 5.) Petitioner appears also to contend that the facts did not otherwise reflect calculation; in this respect, Petitioner notes that her convictions were obtained by plea and argues that the prosecutor in her case would have been "derelict" for permitting a plea to second degree murder if premeditation and deliberation could be proven. (*Id.* at 9.) The California Supreme Court has flatly rejected similar arguments as a basis for finding that a state parole authority acted impermissibly under state regulations (or, correspondingly, violated due process) with respect to denying parole to an inmate convicted of second degree murder. *See Rosenkrantz*, 29 Cal.4th at 678–79, 128 Cal. Rptr.2d 104, 59 P.3d 174.

In *Rosenkrantz*, the state supreme court stated that when determining the gravity of a commitment offense within the meaning of relevant parole regulations, it is fully permissible for the parole authority (or reviewing court) to look to the facts of the offense itself, *regardless* of the type of conviction which may have been obtained on those facts. *See id.*

Thus, the relevant factual question is not what type of conviction an inmate may have suffered, but whether evidence in the record supports the subject parole determination. *Id.; see also, e.g., Shaputis*, 44 Cal.4th at 1258–61, 82 Cal.Rptr.3d 213, 190 P.3d 573 (second degree murder was especially aggravated within meaning of California parole law because record indicated that murder was intentional and premeditated); *Hernandez v. Schwarzenegger*, 2009 WL 29894, *7 n. 2 (N.D.Cal., Jan. 5, 2009) (slip op.) (with respect to parole determination for inmate convicted of second degree murder, noting that "[s]tate law permitted the Governor to reverse the Board's decision [to grant parole] based in part on evidence of premeditation even though the jury's verdict did not encompass a finding of premeditation") (citing, inter alia, *Rosenkrantz*, 29 Cal.4th at 679, 128 Cal.Rptr.2d 104, 59 P.3d 174); *cf. In re Dunham*, 16 Cal.3d 63, 69, 127 Cal.Rptr. 343, 545 P.2d 255 (1976) (full *acquittal* after criminal trial does not preclude revocation of parole based upon evidence in record which indicated that individual had committed the crime of which he had been acquitted). Therefore, under California law, that Petitioner was convicted of two counts of second degree murder does not preclude or circumscribe a parole finding that the subject murders were com-

actually killed her sons was "calm[ ]," as reasonably characterized by the Board, and reflected a deliberate, systematic, and determined course by Petitioner to take the lives of both children. For instance, the record reflects that when Petitioner's one-year-old son woke up during the course of his brother's suffocation, Petitioner gave the one-year-old a bottle to quiet him, resumed and completed suffocating his brother, and then turned her attention back to and suffocated him. (*See, e.g.,* Lodgment 2 at 9–10, Lodgment 3 at 41–42.) And, as Petitioner acknowledged at the parole hearing itself, although both boys had struggled during the course of their suffocation, Petitioner did not stop her actions and continued on her course to kill them both. (Lodgment 3 at 48.)

In addition, Petitioner's asserted motive (she was distraught and felt that she (and, as a result, her children) had been abandoned in light of an argument with her *former* husband in which he had denigrated her sexual ability in comparison to that of his current girlfriend) was an inexplica-ble or trivial one in *relationship* to the offense of murdering her own children who, in turn, were passive victims in the additional sense that they had done nothing to "provoke" their mother's actions, indicating further the aggravated nature of her crimes.[17] *See* 15 Cal.Code Regs. § 2402(c)(1)(E).

Thus, in the instant case, the deliberate nature of the commitment offense against multiple, vulnerable, and suffering victims and a motive which was inexplicable or trivial in relationship to the offense itself made both murders especially aggravated ones. More importantly, in the context of Petitioner's "current demeanor or mental state," *Lawrence,* 44 Cal.4th at 1214, 82 Cal.Rptr.3d 169, 190 P.3d 535, the aggravated nature of the offenses indicated that Petitioner posed a *current* risk to public safety. A connection between the commitment offense and Petitioner's mental state at and around the time of the 2005 parole hearing was made explicit in Petitioner's 2003 psychological report. (Lodgment 7 at 187.) Specifically, Petitioner's 2003 psychological report tied the commitment of-

mitted in a calculated manner where, as here, evidence in the record supports such a finding. And, the bare fact that Petitioner's convictions resulted from a plea does not reflect, as Petitioner appears to suggest, a limiting stipulation or an inference by the prosecution regarding the facts of the offense itself for purposes of parole consideration. Indeed, if so, circumscription of the evidence would be allowed for convictions obtained by a plea which could have been motivated by any number of factors not directly related to the facts of the offense itself (such as a favorable sentence or striking of other charges in exchange for a plea) but, under *Rosenkrantz,* would not be allowed where a conviction resulted from a jury's verdict following the jury's evaluation of the evidence itself in a particular case. *See In re Burdan,* 169 Cal. App.4th 18, 35, 86 Cal.Rptr.3d 549 (2008) ("[t]he fact that [an inmate] entered a negotiated plea of guilty to second degree murder does not preclude the Governor from considering particular aspects of the crime beyond its basic elements"; "[t]hus, while second degree murder does not involve premeditation, the Governor may consider facts suggesting [an inmate] planned and prepared for the murder") (citing *Rosenkrantz,* 29 Cal.4th at 678–79, 128 Cal.Rptr.2d 104, 59 P.3d 174).

**17.** Thus, while Petitioner raises the argument that the Board's finding in this respect was not supported because Petitioner had offered an *explanation* regarding why she had killed her children (Petition Mem. at 10–12), Petitioner does not address the entirety of the unsuitability analysis—the *relationship* of an inexplicable or trivial motive to the *commission* of the particular offense itself. *See* 15 Cal.Code Regs. § 2402(c)(1)(E). As the Board construed it, Petitioner's motive reflected her manner of resolving relationship and abandonment issues by taking the action of killing both of her sons, and therefore was an inexplicable motive in relationship to committing the murders in this case. (Lodgment 4 at 108–09.)

fense and her motive for committing it to Petitioner's *present* diagnosis of borderline personality disorder (a diagnosis later reiterated in the 2005 psychological report) and Petitioner's *current* dangerousness. (*Id.; see* Lodgment 8 at 190, 192, 200.)

As noted, Petitioner's motive for killing her young children-Petitioner's response to an insulting comment from her *former* husband and her alleged and extreme interpretation of it as meaning that she, and in turn her children, had been "abandoned" and without anyone in the world-was inexplicable in that it resulted in her taking brutal and fatal action against two helpless children, acts comprising an aggravating circumstance under relevant parole law. 15 Cal.Code Regs. § 2402(c)(1)(E). In its assessment of Petitioner's dangerousness, Petitioner's 2003 psychological report contained the evaluation that while Petitioner had "made significant strides in improving herself," Petitioner still suffered from "issues of abandonment and rejection[ ]," which could "surface should [Petitioner] be placed into stressful situations." (Lodgment 7 at 188; *see also id.* at 187 (describing Petitioner's efforts at psychological therapy).) "And should these stressful situations be so overwhelming where [Petitioner] may feel hopeless," the 2003 report continued, "this may lead to self-injurious behaviors," which "in borderline personality disorder normally restricts to the patient in most cases. However, this inmate has demonstrated that she can extend her thought process to include those around her that she feels may be helpless should she not [be] living." (Lodgment 7 at 188.) Noting that Petitioner "wanted to return to live with her mother" should Petitioner be granted release, the 2003 report stated that given the described condition of Petitioner's mother and stepfather (referencing a medical condition "currently in remission" suffered by Petitioner's mother, who took care of Petitioner's then terminally ill stepfather), "one can see the same similarities between the conditions of her original crime and her parole plans." (*Id.*)

Thus, the 2003 report found that Petitioner's *current* mental state stemming from her diagnosis of a borderline personality disorder and the facts of her earlier commitment offense and her motive for committing it (which also comprised an aggravating factor under state parole law) was a *specific* predictor of Petitioner's *current* dangerousness, even in an environment to which Petitioner hoped to obtain parole. (Lodgment 7 at 188.) Some two years later, and at the time of the subject parole hearing, Petitioner's 2005 report also reflected Petitioner's *current* diagnosis of borderline personality disorder and Petitioner's same hope of moving in with her mother, with the latter circumstance the specific contextual *example* of risk of dangerousness that was noted in the earlier report.[18] (Lodgment 8 at 189–90, 192, 200.)

The murders may have occurred almost 20 years before the subject hearing but they continued to have probative and predictive value on the issue of Petitioner's *current* dangerousness, in light of their aggravated manner of commission and when considered in conjunction with evidence of Petitioner's *current* diagnosis of borderline personality disorder (characterized in the 2005 report as a "life long mental disorder" (Lodgment 8 at 190, 192)) and the limits to Petitioner's psychological rehabilitation. Thus, although Petitioner contends otherwise (particularly in light of

---

**18.** At the hearing itself, while a number of potential parole plans were discussed, it was indicated that Petitioner had and intended to maintain contact with her "network of friends and family" should she be released on parole. (Lodgment 3 at 55–80, 96–98.)

how long ago the crimes occurred and her efforts at psychological therapy and long-standing "clean" prison disciplinary history) (*see, e.g.,* Petition Mem. at 12–17, 31–32), a nexus between the commitment offense itself and her *current* parole risk was demonstrated via the entire record before the Board. Therefore, the commitment offense, when considered with the psychological reports' assessments thereto, comprised "some evidence" to support the Board's assessment that Petitioner posed a then current risk of dangerousness if released on parole. *See, e.g., Colon v. Dawson,* 2008 WL 2620747, *5–*6 (E.D.Cal., Jul. 3, 2008) (slip op.), *adopted,* 2008 WL 3050869 (E.D.Cal., Aug. 5, 2008) (slip op.) (psychological report noting "moderately low to moderate risk of future violence if released from prison" was linked to evaluating psychologist's concern regarding the petitioner's potential risk for relapse into alcohol abuse; "one of the primary factors in Petitioner's offense was the fact that he was under the influence of alcohol" and, thus, psychologist's report was among evidentiary items comprising "some evidence" to support Board's decision to deny parole); *Elkins v. Brown,* 2006 WL 3782892, *5–*8 (N.D.Cal., Dec. 21, 2006) (slip op.) (among "some evidence" supporting Board's determination that inmate was not suitable for parole was "mixed" psychologist's report which had concluded that inmate was at some, although not high, risk for relapse into substance abuse, and that substance abuse had "played a significant part in the killing" for which inmate was incarcerated).

▮ Moreover, the 2003 and 2005 psychological reports also contained assessments of Petitioner's present mental state *generally,* which further comprised "some evidence" that Petitioner was not suitable for parole release. The *2005* report itself found that Petitioner posed a "low to moderate risk" of dangerousness if she were to be released on parole and indicated also that Petitioner presented an elevated risk for violence as a result of her borderline personality disorder diagnosis; and yet, the 2005 report somewhat unclearly indicated support for Petitioner's release (Lodgment 8 at 189–95, 200); the 2003 report noted the psychiatrist's evaluation that although Petitioner had "made significant strides in improving herself, I do not believe she has achieved the results necessary for her to maintain some level of stability should she be released into the community." (Lodgment 7 at 186–88.) A determination in a psychologist's report that an inmate may present a low to moderate risk of violence to the community if released constitutes "some evidence" supporting a denial of parole, even where such a determination is contained in a report that also may find a low risk of violence by a different testing standard or other positive factors. *See, e.g., Elkins,* 2006 WL 3782892 at *5–*8 (among "some evidence" supporting Board's determination that inmate was not suitable for parole was "mixed" or "guarded" nature of a psychologist's report which, while generally positive, expressed concern regarding inmate's potential for future substance abuse, where inmate's abuse of drugs had played a significant part in subject murder, and, although one measure of probability for violence was rated as low, another measure rated him as at low to medium risk).[19]

---

**19.** *See also, e.g., Totten v. Kane,* 2008 WL 4414292, *9 (N.D.Cal., Sept. 25, 2008) (slip op.) (noting that psychological evaluation that inmate posed "low to moderate risk [of violence] if released on parole" fell within ambit of suitability determination under relevant parole regulations and was among the evidentiary items comprising "some evidence" to support Board's decision to deny parole) (citations omitted); *Colon,* 2008 WL 2620747 at *5–*6 (psychological report noting "moderately low to moderate risk of future violence if released from prison" was among the evi-

And, this is not a case where the record reflects even one, let alone "several consistent psychiatric evaluations [which] have found petitioner no longer suffers from any psychiatric problems" or poses no danger to society should Petitioner be released on parole; thus, the record reflects no *uniformly* and *consistently positive* findings over a prolonged period of time that Petitioner was psychologically sound and would pose no danger to society if released despite the commission of an aggravated commitment offense years before. *Lawrence*, 44 Cal.4th at 1223–24, 82 Cal.Rptr.3d 169, 190 P.3d 535. Indeed, even looking to the last psychological report alone, the report itself was mixed, at best, and contained the assessment that Petitioner still posed a "low to moderate risk" of danger to public safety should she be released.[20]

Thus, in light of the aggravated nature of Petitioner's crimes and the assessments set forth in the 2005 and 2003 psychological reports, there was "some evidence"

before the Board to support its determination that Petitioner was not suitable for parole release because she would pose a then *current* and unreasonable risk of dangerousness to society if released at that time. *See, e.g., Sass*, 461 F.3d at 1129 (where Board based its finding that a state prisoner "was unsuitable for parole on the gravity of his convicted offenses in combination with his prior offenses," such "elements amount to some evidence to support the [BPT's] determination"); *Rosas v. Nielsen*, 428 F.3d 1229, 1232–33 (9th Cir. 2005) ("circumstances of [inmate's] crime, along with his psychiatric reports, constituted evidence with sufficient reliability to support the Board's denial of parole"); *Biggs*, 334 F.3d at 916; *Jancsek v. Oregon Board of Parole*, 833 F.2d 1389, 1390–91 (9th Cir.1987).

 This result is not altered by Petitioner's contention that there was other evidence before the Board which was supportive of Petitioner's release on parole, such as her "clean" prison disciplinary his-

dentiary items comprising "some evidence" to support Board's decision to deny parole).

20. The Court notes that to the extent that Petitioner claims that the Board "completely omitted Petitioner's *current* [2005] psychological evaluation prepared for the hearing that was totally *supportive* of parole, in favor of the outdated one" prepared some two years earlier in 2003 (Petition Mem. at 12 (emphasis in original)), *neither* premise is correct. The Board considered *both* reports and the 2005 report was not "totally *supportive* of parole," given that, as the Board noted, while the 2005 evaluator appeared to support release, the evaluator also found that Petitioner "probably posed" a low to moderate risk of future dangerousness; the 2005 report also indicated an elevated risk of violence derived from Petitioner's borderline personality disorder. (Lodgment 8 at 190, 192, 200.) To the extent Petitioner argues that the earlier 2003 report is irrelevant in light of the 2005 report, Petitioner cites no basis to "supersede" the recent but albeit earlier report (*see* Petition Mem. at 12), particularly where the later report itself

reflected much the same information, diagnosis of a borderline personality disorder, and risk factors, and an assessment of an elevated risk of violence stemming from Petitioner's extant borderline personality disorder. (*Compare* Lodgment 7 at 187–88 with Lodgment 8 at 190–95, 200.) At a minimum, the 2003 report remained relevant to determine whether Petitioner had made any progress between evaluations and, for instance, whether Petitioner had attained successive or continuing positive evaluations, which, as set forth herein, she had not. *See Lawrence*, 44 Cal.4th at 1223–24, 82 Cal.Rptr.3d 169, 190 P.3d 535; *see also* 15 Cal.Code Regs. § 2402(b) ("All relevant, reliable information available to the [Board] panel shall be considered in determining suitability for parole. Such information shall include the circumstances of the prisoner's ... past and present mental state ... and any other information which bears on the prisoner's suitability for release."); § 2281(c)-(d) (Board panel may consider "[a]ll relevant, reliable information available" in determining parole suitability).

tory for many years and her participation in psychological programming. (*See* Petition Mem. at 8–17, 31–32; *see also* Lodgment 3 at 80–87.) On subsequent judicial review of a parole board's decision to deny parole, "[t]o determine whether the some evidence standard is met 'does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached'" by a state parole board. *Sass*, 461 F.3d at 1128 (quoting *Hill*, 472 U.S. at 455–56, 105 S.Ct. 2768). Thus, application of the "some evidence" standard does not call for a reviewing court to reweigh all of the evidence which may have been presented to the Board during a subject parole hearing, and calls for a reviewing court to determine *only* whether "some evidence" supported the panel's decision. *Id.* As discussed herein, the commitment offense itself and Petitioner's psychological evaluations comprised such evidence within the "some evidence" standard. Thus, on subsequent judicial review, it is irrelevant whether *other* evidence was presented to the Board which could be viewed as positive and "favoring" a parole grant, as Petitioner asserts in this case. *Id.* And, to the extent that Petitioner may assert that the Board did not give her any individualized consideration, the record belies that assertion. (*See* Lodgment 3 at 26–117.) The record shows that the Board simply determined that the evidence tending to show unsuitability outweighed any evidence which may have tended to show suitability. (*Id.* at 108–17.)

Petitioner's contention that her right to due process has been violated by the "interminable preclusion of ... parole based *solely* on [Petitioner's] commitment of the second-degree murders" in this case also does not present a basis for overturning her parole denial. (*See* Petition Mem. at 18–32.) Petitioner argues that, "[b]ecause neither her offense facts nor parole suitability otherwise can improve, and because she has served the maximum prison term prescribed for the particular facts of her offenses, denial of parole based on those unchangeable facts has converted her prison term to life without any possibility of parole." (*Id.*)

Apart from failing to establish the specific bases for Petitioner's *earlier* parole denials, Petitioner points to no United States Supreme Court decision which finds that even repeated reliance upon the same or similar evidentiary factors by a state parole board in denying parole, derived from application of relevant provisions of state law (which itself does not bar repeated reliance on such factors), demonstrates a violation of due process or, indeed, prevents such factors from serving as "some evidence" that parole should again be denied in a particular case, even where an inmate's minimum eligible parole date has passed, an inmate has already served the determinate portion of her life sentence, and/or the inmate has been denied parole numerous times before.[21] *See Sass*, 461 F.3d at 1125–26, 1129 (noting that, "[u]nder AEDPA it is not [a federal

---

21. The Court notes that Petitioner contends that, under the purported operation of parole regulations where a multiple murderer like Petitioner has been found suitable for parole, Petitioner's *maximum* eligible parole date also has passed. (Petition Mem. at 9, 31 (citing 15 Cal.Code Regs. § 2407(b)(B)(2)).) Apart from the conclusory and vague nature of Petitioner's arguments and their relevance to whether "some evidence" supported the parole determination in this case, Petitioner had not been found suitable for parole and, thus, the predicate for the purported application of the noted parole regulations had not been triggered.

reviewing court's] function to speculate about how future parole hearings could proceed" with respect to possibility that Board could continue to rely "in the future on an unchanging factor" and that "evidence of . . . prior offenses and the gravity of [state prisoner's] convicted offenses constitute some evidence to support the [Board's] decision" to deny parole; in the case before it, finding "some evidence" supported Board's repeated 1999 and 2000 decisions to deny parole based, each time, on *same* factors of gravity of offense and prior criminal record).

However, the Court recognizes that dicta set forth by the Ninth Circuit in 2003 in *Biggs v. Terhune* and subsequent decisions has stated that in the face of an inmate's continuing demonstration of exemplary behavior and rehabilitation in prison, a parole authority's persistent reliance on an unchanging or immutable factor such as the commitment offense itself and conduct prior to imprisonment to deny parole *eventually* could result in a due process violation.[22] *See Biggs*, 334 F.3d at 916–17; *see also Irons*, 505 F.3d at 853; *Sass*, 461 F.3d at 1129.[23] In *Irons*, the Ninth Circuit noted also "that in all the cases in which

[the Ninth Circuit has] held that a parole board's decision to deem a prisoner unsuitable for parole solely on the basis of his commitment offense comports with due process, the decision was made before the inmate had served the minimum number of years required by his sentence."[24] 505 F.3d at 853.

In this case, Petitioner appears to have reached her minimum eligible parole date and also had served the determinate portion of her 15–years–to–life sentence at the time of the 2005 parole hearing; while Petitioner asserts, the Board had deemed her unsuitable for parole at four prior hearings, in reaching its decision in the hearing that is the focus of this case, the Board did not rely *solely* on "unchanging factors" to deny parole but looked also to whether the record as a whole reflected reliable evidence of Petitioner's current rehabilitation and suitability for parole. (Lodgment 3 at 108–17.) In this respect, among other things, the Board looked to Petitioner's contemporaneous psychological evaluations and her risk for dangerousness should she be paroled (*see id.*); as discussed above, those evaluations, in conjunction with the crime and generally, comprised "some evidence" to support the parole denial.[25] Thus, even if the *Biggs*

---

**22.** *See Kunkler v. Muntz*, 226 Fed.Appx. 669, 670 (9th Cir.2007) (referring to Ninth Circuit's comments in *Biggs* about the continued reliance on the gravity of the commitment offense as presenting possibility of due process violation as *"dictum "*) (*see* Ninth Circuit Rule 36–3). *See also Medway v. Schwarzenegger*, 257 Fed.Appx. 44, 45 (9th Cir.2007), *cert. denied*, —— U.S. ——, 129 S.Ct. 208, 172 L.Ed.2d 167 (2008) ("there is no clearly established Federal law . . . that limits the number of times a parole board or the governor may deny parole based on the brutality of the commitment offense") (*see* Ninth Circuit Rule 36–3); *Culverson v. Davison*, 237 Fed.Appx. 174, 177 (9th Cir.2007), *cert. denied*, —— U.S. ——, 128 S.Ct. 2475, 171 L.Ed.2d 770 (2008) (same) (*see* Ninth Circuit Rule 36–3).

**23.** In the most recent such case—*Hayward v. Marshall*, 512 F.3d 536, 538, 544–48 (9th

Cir.2008)—the Ninth Circuit cited the *Biggs* dicta and granted habeas relief to a 64–year–old state prisoner who had been incarcerated for 27 years on a second degree murder conviction for which he had been sentenced to a term of 15–years–to–life. However, *Hayward* currently is undergoing *en banc* review and may "not be cited as precedent by or to any court of the Ninth Circuit." *See* 527 F.3d 797 (9th Cir.2008) (citation omitted).

**24.** *See* footnote 23, *supra*.

**25.** Moreover, in anticipation of her next parole hearing, the Board also ordered a new psychological evaluation, which the Board indicated should evaluate Petitioner's current mental state and her risk of dangerousness to society if released on parole. (Lodgment 3 at 116.)

dicta were otherwise persuasive or authoritative, it would be inapposite to indicate a due process violation in this case because the Board panel did not rely solely on unchanging pre-offense factors in making its decision to deny parole and, in fact, looked carefully at the *current* record in making that decision.

Therefore, with respect to the allegations of Grounds One through Three which challenge the Board's decision to deny parole, as the state superior court reasonably concluded, the record reflects that "some evidence" supported the Board's decision. In addition, Petitioner's more generalized due process allegations in Grounds One through Three also are without merit. Accordingly, for all the reasons set forth herein, the Court should deny Grounds One through Three in their entirety. *See* 28 U.S.C. § 2254(d).

# VI.

## STATE'S SYSTEMIC POLICY AND BIAS AGAINST GRANTING PAROLE

Grounds Four and Five set forth a number of generalized due process arguments which allege that California's governor and/or parole board maintain a systemic policy and bias against granting parole such that Petitioner's parole denial resulted from such policy and bias and not from her actual suitability for parole; thus, her continued incarceration is improper. (Petition Mem. at 32–35.)

### A. *"Anti-parole" policy*

In Ground Four, Petitioner contends, in part, that California's "executive branch" (citing former Governors Pete Wilson and Gray Davis and the staff of current Governor Arnold Schwarzenegger (the governor at the time of Petitioner's 2005 parole hearing)) implemented and maintain an "anti-parole" policy against life inmates, in particular, those life inmates convicted of murder. (Petition Mem. at 32–33.) In Ground Five, Petitioner contends also that by "underground regulation," California's "[g]overnor" and the Board have established and implemented a "no parole" policy which specifically and directly targets and precludes parole for "all inmates" who, like Petitioner, are incarcerated for the murder of an infant or child victim. (*Id.* at 34–35.) Neither of Petitioner's contentions has merit.

### 1. *Policies implemented and maintained by California's "executive branch"*

In one portion of Ground Four, Petitioner describes an alleged "anti-parole" policy implemented and maintained by California's "executive branch," as follows. (Petition Mem. at 32–33.) According to Petitioner, the policy was initiated by former Governor Pete Wilson when he "referred all cases of indeterminately sentenced inmates (lifers), who had been granted parole but [were] not yet paroled, to [the state parole board], which rescinded nearly all of the paroles by deeming them to have been improvidently granted." (*Id.* at 32.) Petitioner contends that Wilson's successor, former Governor Gray Davis, then "publicly proclaimed" a policy on April 9, 1999 that Davis would preclude the parole of "all inmates who had been convicted of murder" and that, "[p]ursuant to that policy, only six paroles granted to such inmates (in over 8,000 hearings) were allowed to parole over the ensuing five-year period." (*Id.* (footnote omitted).) After Davis left office, Petitioner contends that the staff of current Governor Arnold Schwarzenegger (the governor at the time of Petitioner's 2005 parole hearing) "continued the [anti-parole] policy to a slightly lesser extent, reversing approximately 72% of the very few paroles granted by" the Board, and asserts that purported gubernatorial and parole board statistical evi-

dence reflects that "during the year, 2005 [ (the year of the parole hearing in this case) ], 4,302 parole suitability hearings conducted by [the state parole board] in murder cases resulted, after gubernatorial review, in only 31 actual paroles, or 0.72% (substantially less than 1 in 100)-compared to the parole statute's mandatory requirement that parole should 'normally' be granted to such inmates at their initial hearings. (Pen. C. § 3041(a).)" (*Id.* at 32–33 (footnote omitted).) Petitioner refers the Court to the 2005 federal district court case of *Coleman v. Board of Prison Terms,*[26] then pending on appeal in the Ninth Circuit, as "including evidence reaffirming [the] existence of California's anti-parole policy." (*Id.* at 33 (citing *id.* at Ex. E) (pertaining to federal district court's conclusion that inmate had presented sufficient evidence to show that former Governors Wilson and Davis had implemented a "no parole" policy for murderers in years 1992 through 2001) and *Martin v. Marshall,* 431 F.Supp.2d 1038, 1048–49 (N.D.Cal.2006) (citing *Coleman* and finding that its reasoning regarding "no parole" policy of Governors Wilson and Davis "further justifies a grant of relief" and new parole suitability hearing on the basis that denial of parole under noted policy had denied inmate his due process right to be heard by an impartial decisionmaker)).

In *Coleman,* the federal district court determined that the petitioner in that case had presented sufficient evidence to show that between 1992 and 2001, former Governors Wilson and Davis had implemented a "no-parole" policy for convicted murderers; indicated that the Board's challenged 1995 parole hearing (and resulting parole denial) conducted "under" that policy was *per se* invalid, and issued a conditional writ of habeas corpus requiring the Board to

hold a new parole suitability hearing "free of any prejudice stemming from a gubernatorial policy against parole for murderers." 2005 WL 4629202 at *4; *see* 228 Fed.Appx. at 674.

In July 2005, the Board held a new hearing and again determined that the petitioner was unsuitable for parole. 228 Fed.Appx. at 674. In 2007, after the Board's hearing, the Ninth Circuit dismissed the Board's appeal of the district court's grant of habeas relief arising from the 1995 parole hearing, finding that "the action was made moot not merely by the Board having complied with the district court's order to hold a new parole hearing for [the petitioner], but also because Governor Arnold Schwarzenegger had been elected by [the time of the subsequent hearing in] July 2005, and ... the record is bereft of any evidence that the Schwarzenegger administration instituted a 'no parole for murderers' policy." *Id.* at 675–76. In addition, the Ninth Circuit stated that "the district court's findings in this case and the evidence on which they are based should not be extrapolated to parole challenges by other prisoners" and noted further that while the Ninth Circuit did not "reach the propriety of [the] district court's finding relating to the Wilson and Davis administrations, we do note that the only hearing challenged by the habeas petition, the 1995 hearing, occurred during the Wilson administration." *Id.* at 675–76 and ns. 5–6.

As the Ninth Circuit indicated in its disposition of the principal case cited by Petitioner in support of her allegations of bias (*see also* Ninth Circuit Rule 36–3), with respect to a challenge to a particular parole denial, relevant evidence of an alleged "anti-parole" policy is that which

---

**26.** 2005 WL 4629202 (E.D.Cal., Dec. 2, 2005), *appeal dismissed,* 228 Fed.Appx. 673 (9th Cir. 2007).

pertains to the state administration in place at the time of the subject parole hearing itself, here, the Schwarzenegger administration.[27] *Coleman*, 228 Fed.Appx. at 674–76 and ns. 5–6.[28] While Petitioner has claimed vaguely that "Governor Schwarzenegger's staff ... has continued [his predecessors' alleged "anti-parole"] policy to a slightly lesser extent," as an indication of the "continuation" of the alleged "anti-parole" policy, Petitioner points only to the purported number of *gubernatorial reversals* of *parole grants* by the Board, noting that in 2005, "after gubernatorial review, ... only 31 actual paroles" resulted from the "4,302 parole suitability hearings conducted by [the parole board] in murder cases[.]" (Petition Mem. at 32–33 (footnote omitted).) Thus, Petitioner

appears to claim that the alleged rate of gubernatorial reversals signifies a parole bias by the Schwarzenegger administration itself. (*Id.*) In this case, however, Petitioner was denied parole by a Board panel, with no reversal by the Schwarzenegger administration, and, thus, Petitioner's own case does not fall within the specific circumstance Petitioner has alleged to indicate an "anti-parole" policy. Moreover, Petitioner's allusion to *grants* of parole by the *Board* which are subject to a later reversal by the governor's staff undermines a claim that a blanket gubernatorial "no parole" policy exists which is "enforced" by the Board itself.[29] As discussed further below, the record before the Court indicates that the parole denial in *Petitioner's* case derived from her panel's evalua-

**27.** The Court notes that Petitioner *may* claim that her *previous* denials of parole resulted from the alleged "anti-parole" policies of Schwarzenegger's predecessors in office at the time of such denials and therefore violated due process. (*See* Petition Mem. at 32–33.) But, such a claim does not establish a basis for relief in this action because it is too vague and conclusory; any prior parole denials are not before the Court; and given her subsequent parole hearing under the Schwarzenegger administration, such a claim would be moot, in any event. *See, e.g., Coleman*, 228 Fed.Appx. at 674–76 and ns. 5–6; *cf. Garcia v. Mendoza–Powers*, 2008 WL 3915356, *12 (E.D.Cal., Aug. 22, 2008), *adopted*, 2008 WL 4468644 (E.D.Cal. Sept. 29, 2008) (slip op.) (petitioner failed to establish prejudice resulted from parole denial alleged to have resulted from Board's application of a "no parole" policy in effect during the administration of Governor Davis; after Governor Davis left office, petitioner had another parole suitability hearing at which he again was found unsuitable for parole and, "[t]herefore, petitioner has already received all the relief to which he would entitled with respect to this claim: a new parole hearing before an unbiased Board panel").

**28.** *See also, e.g., Rio v. Board of Prison Terms Commissioners*, 2006 WL 3783575, *9 (N.D.Cal., Dec. 21, 2006) (slip op.) (rejecting

claim that parole board denied parole in 2005 pursuant to a "no parole" policy; noting that "bias [the petitioner] claims existed was based on former Governor Gray Davis' alleged no-parole policy but the former governor's policies and statements cannot be attributed to his successor" and the petitioner had not presented any "evidence of a no-parole policy by Governor Schwarzenegger or the Board panel under Governor Schwarzenegger's administration that held [the petitioner's] subsequent parole hearing in 2005").

**29.** In any event, Petitioner also does not establish that at the time of her 2005 hearing, *any* of the alleged reversals by the Schwarzenegger administration to which she refers were derived not from the individual facts of a particular case but from a policy to deny parole to any inmate incarcerated for murder. Nor does Petitioner point to any other evidence indicating that the Schwarzenegger administration had a "no parole" policy for convicted murderers nor carried forward any *prior* alleged gubernatorial "no parole" policy. In Petitioner's case, as discussed herein, the record also does not reflect the Board's sole reliance on her commitment offense as a basis to deny parole. Thus, Petitioner does not establish that she was denied parole as a result of her status as a murderer pursuant to a purported "anti-parole" policy against murderers.

tion of her parole suitability at the time of her hearing, including Petitioner's contemporaneous psychological evaluations and her risk for dangerousness should she be paroled. *See, e.g., Rio,* 2006 WL 3783575 at *9.

■ Thus, as set forth above, Petitioner's allegations in Ground Four directed toward a due process violation resulting from a purported "anti-parole" policy by California's "executive branch" are, at best, too vague, conclusory, and lacking in adequate factual and legal support to establish a basis for federal habeas relief. *See, e.g., Dows v. Wood,* 211 F.3d 480, 486–87 (9th Cir.2000) (factually unfounded claim presents no basis for federal habeas relief); *Jones v. Gomez,* 66 F.3d 199, 204–05 (9th Cir.1995) (vague speculation or mere conclusions unsupported by record not sufficient to state claim; "conclusory suggestions ... fall far short of stating a valid claim of constitutional violation"); *Turner v. Calderon,* 281 F.3d 851, 881 (9th Cir.2002) (citing *Cuppett v. Duckworth,* 8 F.3d 1132, 1139 (7th Cir.1993)(en banc) (" '[S]elf-serving statements by a defendant that his conviction was constitutionally infirm are insufficient to overcome the presumption of regularity accorded state convictions' "), as quoted in *United States v. Allen,* 153 F.3d 1037, 1041 (9th Cir. 1998)). Accordingly, the Court should deny this portion of Ground Four. *See* 28 U.S.C. § 2254(d).

**2. *"Underground regulation" precluding parole for "all inmates" incarcerated for the murder of an infant or child victim***

In another permutation of a "no parole" policy claim, in Ground Five, Petitioner refers vaguely to her counsel's knowledge of ten or so parole cases and possibly separate alleged anecdotal accounts by unidentified attorneys of an untold number that indicate, by "underground regulation,"

"[t]he Governor" and the Board "have established and implement" a "no parole" policy directly targeting and precluding parole for "all inmates" who, like Petitioner, are incarcerated for the murder of an infant or child victim. (Petition Mem. at 34–35.)

Petitioner's allegations in this respect are remarkably vague and limited. The allegations lack *any* specificity in terms of time frame, *actual* statistics regarding parole decisions in murder cases involving an infant or child victim, details of any alleged accounts (hearsay or otherwise) of any purported "underground regulation," or even an identification of the "Governor" to whom Petitioner may refer. (Petition Mem. at 34–35.) Like her allegations in Ground Four, Petitioner's vague and conclusory arguments are supported by no evidence regarding the existence of any such policy by the gubernatorial administration in place at the time of her 2005 hearing (the Schwarzenegger administration) or even the Board as a whole at that time. Moreover, as discussed below, Petitioner does not establish that the parole denial in her case derived from anything other than her panel's evaluation of her parole suitability at the time of her hearing. *See, e.g., Rio,* 2006 WL 3783575 at *9. Thus, Petitioner's allegations in Ground Five which are directed toward a due process violation resulting from "[t]he Governor's" and the Board's alleged "underground regulation" to deny parole to inmates incarcerated for the murder of an infant or child victim are, at best, too vague, conclusory, and lacking in adequate factual and legal support to establish a basis for federal habeas relief. *See, e.g., Dows,* 211 F.3d at 486–87; *Jones,* 66 F.3d at 204–05; *Turner,* 281 F.3d at 881. Accordingly, the Court should deny Ground Five. *See* 28 U.S.C. § 2254(d).

## B. *Bias arising from composition of Board*

In Ground Four, Petitioner alleges a due process violation which pertains to a purported bias which arises from the composition of the Board. (Petition Mem. at 33–34.) According to Petitioner, bias is indicated because 31 of the (then) last 34 appointed parole commissioners purportedly came from inherently anti-parole backgrounds (described by Petitioner as former law enforcement personnel, anti-parole legislators, and/or crime victim advocates); "[a]t the time of Petitioner's hearing, all commissioners (except those 'inherited' from the Youth Authority and Narcotics Board when they merged with [the parole board]) were in those categories"; and "[a]ll [commissioners] are strictly political appointees to promote the governors' publicly proclaimed anti-parole mandate." (*Id.*) Also pointing to California Penal Code § 5075(b), Petitioner contends that the appointment of such allegedly biased commissioners violates the state statute's requirement that " '[t]he selection of [commissioners] and their appointment by the Governor and confirmation by the Senate shall reflect as nearly as possible a cross section of the racial, sexual, economic, and geographic features of the population of the state.' " (*Id.* at 33.) Petitioner claims that the composition of the Board violates the state statute's cross-section requirement in other respects, such as place of residence and the financial and employment status of appointed commissioners. (*Id.*) Thus, Petitioner argues:

> In the face of such appointments and the Board's constituency, it is virtually impossible to constitute a parole panel not inherently biased against Petitioner and her parole. [The Board's] constitu-

ency violates the intent and the mandatory ("shall") language of Pen. C. § 5075, insures bias and fundamental unfairness, and violates the liberty interest and right to due process vested in Petitioner by the State's parole laws and by the Due Process Clause of the Federal Constitution.

(*Id.*) Petitioner's contentions have no merit.

 A prisoner has a right to have his or her parole application considered by a "neutral and detached body" that is "free from bias or prejudice." *O'Bremski v. Maass*, 915 F.2d 418, 422 (9th Cir.1990) (citing *Schweiker v. McClure*, 456 U.S. 188, 195, 102 S.Ct. 1665, 72 L.Ed.2d 1 (1982)).[30] In the parole revocation context, the neutrality requirement is satisfied if the revocation decision is made by "someone such as a parole officer other than the one who has made the report of parole violations or has recommended revocation." *Morrissey*, 408 U.S. at 486, 92 S.Ct. 2593. Neutrality does not require employment by a different agency, a law degree, or election or appointment as a judicial officer. *Id.*

 Petitioner fails to offer any evidence in support of her general and conclusory assertions of bias, including a showing of bias by *any* of the individual commissioners on her Board panel. Petitioner does not allege that either of the Board commissioners who denied her parole release were responsible for her arrest or prosecution, or had stated prior to her parole hearing that they considered her unfit for parole release. Indeed, at her 2005 hearing, Petitioner and her hearing counsel stated that they had no objection Petitioner's own panel, belying Petitioner's current claim of bias in the

---

**30.** *See also, e.g., Edwards v. Balisok*, 520 U.S. 641, 647, 117 S.Ct. 1584, 137 L.Ed.2d 906 (1997) (prison disciplinary hearing); *Morris-* *sey v. Brewer*, 408 U.S. 471, 488–89, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) (parole revocation hearing).

decision rendered against her on the grounds asserted herein. (Lodgment 3 at 35–36). *See, e.g., Burgess v. Curry,* 2008 WL 2276254, *6 (N.D.Cal., May 30, 2008) (slip op.) (rejecting petitioner's claim that Board was biased, in part, because petitioner and hearing counsel "declined to object to the panel at the time of the parole hearing"; stating that petitioner "may not now attack the composition of the Board simply because he received an unfavorable decision"); *Morrissey,* 408 U.S. at 488–89, 92 S.Ct. 2593 (stating that, in parole revocation context, "minimum requirements of due process" for fair hearing include "a 'neutral and detached' hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers"). And, the record before the Court shows that the Board panel in Petitioner's case based its decision on an individualized assessment of Petitioner's circumstances (*see* Lodgment 3 at 108–17): "some evidence" supported the panel's decision. Finally, to the extent Petitioner raises a claim based on a violation of alleged state law requirements regarding the composition of the Board itself, apart from the vagueness of Petitioner's allegations and her failure to show any systemic or actual bias resulting from the alleged violation of any such state law requirements, a claim of state law error is not cognizable on federal habeas review. *See, e.g., Rose v. Hodges,* 423 U.S. 19, 21, 96 S.Ct. 175, 46 L.Ed.2d 162 (1975). Thus, this portion of Ground Four also fails.

Accordingly, for the reasons set forth herein, the Court should deny Ground Four in its entirety. *See* 28 U.S.C. § 2254(d).

## VII.

## RECOMMENDATION

For all of the foregoing reasons, IT IS RECOMMENDED that the Court issue an Order: (1) approving and adopting the Report and Recommendation and (2) directing that the Petition be denied and the action be dismissed with prejudice.